690 A.2d 203

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kevin J. MARINELLI, Appellant.**

Supreme Court of Pennsylvania.

Argued April 29, 1996.

Decided Feb. 25, 1997.

300

302

James J. Rosini, Shamokin, for K. Marinelli.

Robert B. Sacavage, Sunbury, Anthony J. Rosini, Shamokin, Robert A. Graci, Office of Attorney General, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION OF THE COURT

CAPPY, Justice.

This is a direct appeal from the judgment of sentence of death imposed on appellant, Kevin J. Marinelli, by the Court of Common Pleas of Northumberland County, Pennsylvania.

Appellant and his co-defendant Thomas Kirchoff (Kirchoff) each were charged in connection with the killing of Conrad Dumchock and were tried jointly.[1] Following a jury trial, appellant was found guilty of: 1) criminal homicide (first degree murder)[2]; 2) robbery[3]; 3) conspiracy to commit rob-

---

1. Mark Marinelli, who is appellant's brother, entered into a plea agreement whereby he pled guilty to second degree murder in exchange for his testimony against appellant and co-defendant Kirchoff.

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 3701.

bery [4]; 4) burglary [5]; 5) theft by unlawful taking [6]; 6) receiving stolen property [7]; and 7) aggravated assault.[8] Co-defendant Kirchoff was found guilty of each of the same offenses as appellant, with the degree of homicide being second degree. After the penalty phase hearing, the jury returned a sentence of death on appellant's first degree murder conviction. The jury concluded that the two aggravating circumstances it found (defendant committed the killing while in the perpetration of a felony,[9] and defendant committed the offense by means of torture) [10] outweighed the two mitigating circumstances it found (defendant had no significant history of prior convictions,[11] and other evidence in mitigation concerning the character and record of the defendant).[12]

In addition to imposing judgment of sentence of death for the first degree murder, the trial court, by further sentencing orders dated August 11, 1995, imposed judgment of sentence on appellant as follows: for the robbery conviction, imprisonment for a term of not less than ten (10) nor more than twenty (20) years, to run consecutive to the sentence for the first degree murder; for the conspiracy to commit robbery conviction, imprisonment for a term of not less than five (5) nor more than ten (10) years, to run consecutive to the sentence for the robbery conviction; and, for the burglary conviction, imprisonment for a term of not less than ten (10) nor more than twenty (20) years, to run consecutive to the sentence for the conspiracy to commit robbery conviction.

Appellant's judgment of sentence was automatically appeal-

4. 18 Pa.C.S. § 903.
5. 18 Pa.C.S. § 3502.
6. 18 Pa.C.S. § 3921.
7. 18 Pa.C.S. § 3925.
8. 18 Pa.C.S. § 2702.
9. 42 Pa.C.S. § 9711(d)(6).
10. 42 Pa.C.S. § 9711(d)(8).
11. 42 Pa.C.S. § 9711(e)(1).
12. 42 Pa.C.S. § 9711(e)(8).

ed to this court.[13] For the reasons expressed herein, we affirm appellant's convictions and the judgments of sentence imposed on him.

The testimony at appellant's trial established the following facts. On the evening of April 26, 1994, appellant and his brother, Mark Marinelli (Mark), and Kirchoff met at appellant's apartment to plan a burglary of the residence of Conrad Dumchock (Dumchock), whom Mark knew to have stereo equipment. The three men obtained weapons, disguises, and gloves in preparation for the burglary, and proceeded to Dumchock's home in Kulpmont.

Dumchock was home alone and had just spoken to his sister and brother-in-law on the telephone for forty-five minutes. The Marinelli brothers and Kirchoff arrived at Dumchock's home and initially had difficulty gaining entry. Observing that Dumchock's car was parked outside his house and concerned about the possibility of being discovered, the threesome left Dumchock's residence but returned a few minutes later to again attempt to enter. Eventually, they broke a small window in the kitchen door and entered the residence.

Upon entering Dumchock's residence, appellant immediately proceeded to the second floor, where he encountered Dumchock. When Dumchock requested that appellant leave his home, appellant struck Dumchock's face with his gun and yelled for assistance from Mark and Kirchoff.

The appellant and Kirchoff continued to beat Dumchock, despite Dumchock's pleading with them to take what they wanted and leave him alone. The three rummaged through Dumchock's home looking for items to take and asking Dumchock where his guns and money were located. When Dumchock would moan or not answer, appellant would hit Dumchock again.

Mark and Kirchoff departed Dumchock's home after they had loaded the items they wished to steal, while appellant remained in the residence with Dumchock. Appellant then shot Dumchock twice in the head, with one shot into Dum-

13. 42 Pa.C.S. § 722(4); 42 Pa.C.S. § 9711(h).

chock's eye and the other directly between Dumchock's eyes. Appellant then ran out of Dumchock's house and exclaimed, "Let's get out of here!"

The threesome returned to Kirchoff's home and divided the items stolen from Dumchock. A short while later, the Marinelli brothers returned to Dumchock's house and took a motorcycle from the victim's porch. Appellant attempted to start the motorcycle on compression, with Mark following in a car. They were observed crossing the main road in Kulpmont heading toward the other side of town. When the motorcycle would not start, appellant abandoned it.

On the morning following the killing, Clyde Metzger, who was waiting for Dumchock to drive him to work, entered the victim's home and discovered Dumchock's stereo equipment had been disarranged and Dumchock's dog was shaking. Metzger called out to Dumchock but received no response. Metzger became concerned and left Dumchock's home, and headed to the police station. On his way there, Metzger encountered a Kulpmont Police Sergeant Detective Robert Muldowney, and related to him the circumstances he had found.

Sergeant Muldowney entered Dumchock's home, noting that the storm door was open, the inside door was propped open with a chair, and the glass had been broken from a window in the door. Inside the house, Sergeant Muldowney discovered that telephone cords had been cut. Upstairs, Sergeant Muldowney discovered the victim's cold body lying at the top of the stairway landing. Sergeant Muldowney noted that Dumchock's bedroom was disheveled, with drawers removed from the dresser and various items strewn on the victim's bed. Pennsylvania State Police and County Coroner Richard Ulrich were called to the scene. The victim's sister also arrived at his house and noted that Dumchock's motorcycle was missing. The motorcycle was later recovered hidden in some brush where it had been abandoned. Dumchock's brother-in-law informed police that guns, tools, and electronic equipment were also missing from Dumchock's residence. One of Dumchock's friends, David Dormer, was brought to Dumchock's

residence to assist police in determining which stereo equipment, as well as liquor, was missing.

On May 25, 1994, Mark Marinelli's girlfriend, Deeann Chamberlain, turned over to Coal Township Police certain weapons which Mark had brought to her home. These weapons were later identified as having belonged to the victim. County Coroner Ulrich was at the Coal Township police station when Ms. Chamberlain turned over these weapons. The coroner connected the items with the Dumchock killing, and notified the District Attorney and State Police. Further, Ms. Chamberlain allowed Shamokin Police to come to her home and remove other items Mark had left there, including a telephone answering machine. Coroner Ulrich recognized the telephone answering machine as being of the type reported missing from Dumchock's house, and he notified the State Police.

Additionally, a friend of appellant, Nathan Reigle, was questioned by police about the Dumchock murder. Reigle stated to police that appellant had bragged about how he had killed Dumchock. A search of appellant's residence by police recovered a number of items, including stereo equipment, later identified as property belonging to the victim. After being questioned by police, appellant gave police both an oral and a taped confession as to his involvement in the Dumchock killing.

Proceeding under new Pa.R.Crim.P. 1410 B(1)(c), appellant in this matter elected not to file a post-sentence motion with the trial court.[14] His issues on appeal were enumerated in his Statement of Jurisdiction, which was filed along with his notice of appeal to this court. The trial court subsequently filed an

---

**14.** *See* Pa.R.Crim.P. 360 and 1410. Rule 1410, as it presently exists, was adopted in 1993, and is effective as to cases in which the determination of guilt occurred on or after January 1, 1994. Appellant herein was found guilty on May 18, 1995; thus, new Rule 1410 is effective as to him. New Rule 1410 B(1)(c) provides:

c) Issues raised before or during trial shall be deemed preserved for appeal whether or not the defendant elects to file a post-sentence motion on those issues.

As appellant herein proceeded under this subsection, any issue raised before or during trial is deemed preserved for appeal.

opinion pursuant to Pa.R.A.P. 1925(a). Appellant's notice of appeal and brief to this court indicate that he is challenging all of the trial court's judgments of sentence, dated August 11, 1995, in this matter.

■ Appellant's brief presents boilerplate challenges to the sufficiency and weight of the evidence, requesting this court to grant him new trial or arrest of judgment without developing his argument or setting forth the considerations we must address. Nevertheless, in all cases in which the death penalty is imposed, we must conduct an independent examination of the sufficiency of the evidence supporting the appellant's conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

"In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt." *Commonwealth v. Hughes*, 536 Pa. 355, 361, 639 A.2d 763, 766 (1994). We review the record with these standards in mind.

■ In a first degree murder [15] case, the Commonwealth must prove that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with malice aforethought, in addition to the establishment of premeditation and deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481 (1980).

15. **18 Pa.C.S. § 2502. Murder.**
 (a) **Murder of the first degree.**— A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
 "**Intentional killing.**" Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

■ The evidence establishes that appellant broke into the victim's home with knowledge that his vehicle was parked outside; appellant beat and questioned the victim regarding the location of his money and guns; appellant shot the victim at close range in the head, with one shot into his open eye and the other between his eyes; and appellant and his co-conspirators divided the items. Appellant's use of a gun on a vital part of Dumchock's body is sufficient to establish his specific intent to kill. The evidence was sufficient for the jury to conclude that appellant acted with a specific intent to kill; that Dumchock was unlawfully killed; that appellant did the killing; and that the killing was done with deliberation. Our independent review of the record convinces us that the evidence presented was, indeed, sufficient to support appellant's convictions for first degree murder, robbery, conspiracy to commit robbery, burglary, theft by unlawful taking, receiving stolen property, and aggravated assault.[16]

■ We next turn to appellant's allegation that the verdict was contrary to the weight of the evidence. "A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). Appellant does not develop this issue or in any way show how the award of a new trial is imperative. After a complete and thorough review of the record in this matter, we find that the verdict was not against the weight of the evidence.[17]

16. Although appellant only specifically alludes to the sufficiency of the evidence as to his first degree murder conviction in his brief, we have addressed the sufficiency of the evidence to support each of appellant's convictions, as he has appealed the judgments of sentence for each conviction.

17. Ordinarily, our scope of review of an allegation that the verdict was against the weight of the evidence is limited to a determination of whether the trial court abused its discretion in denying relief of such claim. Since appellant proceeded according to Pa.R.Crim.P. 1410 here and did not file a post-sentence motion, the trial court has not had an opportunity to rule on this issue; however, since the penalty of death is imposed, we are considering this issue from the record. See *Common-*

 Appellant next contends that the Commonwealth failed to prove torture beyond a reasonable doubt. The aggravating circumstance of torture set forth in 42 Pa.C.S. § 9711(d)(8) must be proven beyond a reasonable doubt. 42 Pa.C.S. § 9711(c)(1)(iii). In order to establish torture, the Commonwealth must prove that the defendant had a specific intent to inflict "a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1091 (1993)(citing *Commonwealth v. Thomas*, 522 Pa. 256, 277, 561 A.2d 699, 709 (1989)). As we explained in *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987):

> The aggravating circumstance provides an additional element to the intentional killing which justifies the ultimate sentence. Thus subsection 8 of section 9711 must of necessity require more than a mere intent to kill. Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill.

*Id.* at 279–80, 523 A.2d at 737 (footnote omitted). Moreover, this court recently stated in *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305 (1996):

> Neither the efficacy of the means employed by a defendant to murder his victim nor the immediacy of death is in itself determinative of the question whether the offense was committed by means of torture. *Commonwealth v. Caldwell*, 516 Pa. 441, 448, 532 A.2d 813, 817 (1987). There must be an indication that the killer was not satisfied with the killing alone. *Edmiston*, [*supra* ].

*Id.* at 551, 681 A.2d at 1321.

 A forensic pathologist, Dr. Isidore Mihalakis, determined the victim's cause of death was two gunshot wounds to his head, and the killing was considered a homicide. Dr. Mihalakis testified that prior to receiving the two gunshot wounds to his head, the victim received two types of impact

*wealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987). We further note that the trial court's opinion prepared pursuant to Pa.R.A.P.1925(a) indicates that the verdict was not against the weight of the evidence.

injuries: those from a cylindrical object, consistent with the throat of a baseball bat, and those administered by kicks. The victim had separate injuries to his left arm and hand, and had injuries to his left leg, upper chest, right side of his abdomen, right hand, base of his neck and the skin around his neck, left ear, cheek, head and scalp. The victim suffered twelve fractures to his ribs, and forty-seven blunt force injuries in all.

Dr. Mihalakis testified the victim's bruises indicated that considerable force was used on him and that he suffered extreme pain as a result of the beating. Dr. Mihalakis further determined that the victim's wounds resulted from a beating which lasted at least one half hour and perhaps as long as two hours. Moreover, the forensic pathologist determined that because there was gunpowder residue present on the victim's hand from his attempt to ward off his killer and his eye was open at the time he was shot, the victim had been conscious and aware of what was happening during the beating.

We find that the Commonwealth proved the aggravating circumstance of torture beyond a reasonable doubt in this matter.

Appellant next argues that the trial court erred in granting the Commonwealth's motion to consolidate the trial of appellant with that of his co-defendant Kirchoff, and in refusing to sever the trials. Appellant contends that at the point in the proceedings when he brought his first motion for severance, all three defendants were to be tried together, since Mark had not yet entered into a plea arrangement with the Commonwealth. At this time, appellant contends that conflicting defenses were anticipated to be presented at trial by Mark, Kirchoff, and appellant, with each defendant clearing himself of the homicide charge. Kirchoff claimed to have been outside when the shooting occurred; Mark claimed appellant did the killing; and appellant claimed that Mark placed him under duress and forced him to kill the victim. Appellant asserts that he brought his second motion for severance on April 21, 1995, after Mark entered a plea of guilty to second

degree murder in exchange for his testimony.[18] At this time, appellant argues that Mark essentially became a witness for the prosecution, and that appellant's trial should then have been severed from that of co-defendant Kirchoff.

The decision on whether to grant a motion for severance rests within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991), *cert. denied*, 502 U.S. 849, 959, 112 S.Ct. 152, 442, 116 L.Ed.2d 117, 442 (1991). Where, as in the present matter, the defendants have been charged with conspiracy, joint, rather than separate, trials are preferred. *Id.*

Severance may be proper, however, where a defendant can show that he will be prejudiced by a joint trial. *Id.* The fact that hostility exists between the defendants or that one defendant may try to save himself at the expense of the other constitutes insufficient grounds to require severance. *Id.*

In *Chester*, where each defendant conceded participation in the killing and disputed only his respective acts in furtherance thereof, this court found inconsistency rather than antagonism. As we pointed out in *Chester*, "the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together." *Chester*, 526 Pa. at 590, 587 A.2d at 1373. "Defenses become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his codefendant." *Id.* at 590, 587 A.2d at 1373.

The defenses in this matter presented merely inconsistency, not antagonism. None of the defendants in the present matter disputed that it was appellant who shot the victim.

**18.** While the record reflects that the trial court entered an order on December 1, 1994 denying appellant's motion for severance, there is no April 21, 1995 motion for severance in the record, nor is there any order ruling on such a second motion for severance.

The inconsistency was as to whether Kirchoff was in the victim's home when the shooting occurred, and whether Mark forced appellant to pull the trigger. We find no manifest abuse of discretion on the part of the trial court in refusing severance of this consolidated trial.

Next, appellant contends that it was error for the trial court to deny appellant's motions for a change of venue/venire made both prior to and after Mark's guilty plea. Appellant claims that inherently prejudicial pre-trial publicity occurred in the three newspapers circulated in Northumberland County and through coverage on local and regional television news following appellant's arrest in May of 1994 and continued throughout the summer and autumn of 1994. Appellant asserts that in this pre-trial publicity, he and his co-defendant were described as "skinheads"; other unrelated crimes with which appellant and his co-defendants were charged were discussed; confessions and admissions by appellant and his codefendants relating to the Dumchock killing were discussed; and statements by law enforcement officials regarding appellant's guilt were discussed. He further asserts that similar publicity began in April of 1995, after Mark pled guilty to second degree murder, prompting appellant's second motion for change of venue/venire, and continued until a few weeks before trial commenced on May 8, 1995. Appellant urges that this pre-trial publicity resulted in an inability to select a fair and impartial jury in Northumberland County.

The trial court's decision on appellant's motions for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion. *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 450 (1995).

> In reviewing the trial court's decision, our inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity. Pre-trial publicity will be deemed inherently prejudicial where the publicity is sensational, inflammatory, slanted towards conviction rather than factual and objective;

revealed that the accused had a criminal record; referred to confessions, admissions or re-enactments of the crime by the accused; or derived from reports from the police and prosecuting officers. However, even if one of these elements exists, a change of venue will not be required where there has been sufficient time between publication and trial for the prejudice to dissipate.

*Paolello,* 542 Pa. at 68, 665 A.2d at 450 (quoting *Commonwealth v. Gorby,* 527 Pa. 98, 108, 588 A.2d 902, 906 (1991) (citations omitted)).

We pointed out in *Paolello* that a change of venue becomes necessary when a fair and impartial jury cannot be selected. The trial court in the instant matter took measures to ensure that the jury panel consisted of jurors who were fair and impartial and had no "fixed opinion". Individual voir dire was conducted, and jurors who had recently read a prejudicial account of the crime were stricken for cause. The trial court granted appellant great leeway in questioning prospective jurors, and as each juror was selected, he or she was immediately sequestered. All of the jurors selected indicated that they had not formed an opinion and could apply the law as given in the court's instructions. We accordingly find the trial court did not err in denying appellant's request for change of venue. *See Commonwealth v. Tedford,* 523 Pa. 305, 567 A.2d 610 (1989).

Appellant next claims that the suppression court erred by refusing to suppress the statements he made to police, alleging that these statements were made in violation of his right to a speedy arraignment, citing *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977).

 Our scope of review in evaluating the trial court's refusal to suppress evidence is determining whether the factual findings of the suppression court are supported by the record.

"When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the

record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error. (Citations omitted.)" ... Thus, if sufficient evidence is of record to support the suppression court's ruling and that court has not misapplied the law, we will not substitute our credibility determination for that of the suppression court judge.

*Commonwealth v. Queen*, 536 Pa. 315, 319, 639 A.2d 443, 445 (1994)(quotation omitted).

▇▇▇▇ Appellant claims that on May 26, 1994, while he was being held in the Northumberland County Prison on an arrest in another criminal matter, he was transported by State Police troopers to the basement of the Sunbury Police Station, where he was kept handcuffed and in leg irons and was questioned about the Dumchock killing. Appellant asserts that this questioning on May 26, 1994 amounted to an arrest under *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982), and that any subsequent statements he made to police must be suppressed as violative of the six hour rule.[19]

▇▇▇▇▇ The six hour rule of *Davenport*, as modified in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987), provides that if the accused is not arraigned within six hours of his arrest, any statement obtained after arrest but before arraignment shall not be admissible at trial. If a statement is obtained from a suspect during the six hour period following arrest within which the suspect is to be arraigned, absent coercion or other illegality, it is not obtained in violation of the rights of the accused. "The six hour rule requires that an arrestee be arraigned within six hours of arrest in recognition of the inherently coercive nature of prolonged custodial inter-

19. The suppression court did not address any alleged violation of the six hour rule, as this issue was not specifically raised in appellant's pre-trial motion. We have addressed appellant's suppression argument under our relaxed waiver standard for capital appeals. *See Zettlemoyer, supra.*

rogation." *Commonwealth v. Bond,* 539 Pa. 299, 307–308, 652 A.2d 308, 312 (1995).

The testimony at the pre-trial motion hearing shows that on the evening of May 26, 1994, Trooper Ronald Clark placed appellant in handcuffs and leg irons, and transported appellant from the Northumberland County Prison to the Sunbury Police Department, where he was interviewed in a basement area. Appellant was not read his *Miranda* rights,[20] but was instructed that he was not under arrest and he was free to not talk to Trooper Clark and Trooper Beth Wilson and to be returned to prison. After about a half hour, Trooper Clark terminated the interview and returned appellant to prison. At this interview, appellant made no incriminating statement to police.

A criminal complaint and warrant of arrest was filed on May 27, 1994, and appellant was arraigned that same day. Appellant was provided with a copy of the criminal complaint filed against him and the attached affidavit. At 5:15 p.m. on May 27, following his arraignment on the charges in this case, appellant was advised of his *Miranda* rights and he signed a *Miranda* warning card. An oral confession was taken from appellant by Troopers Richard Bramhall, Jr. and Corporal Carey Latsha. Both Trooper Bramhall and Corporal Latsha testified that appellant did not request counsel at any point during this interview.

Additionally, on May 28, 1994 at approximately 5:05 p.m., appellant willingly provided Trooper Bramhall with a taped statement at Northumberland County Prison. Trooper Bramhall testified that *Miranda* warnings were given to appellant prior to this taped statement.

Appellant acknowledges in his brief that he made no statements to police on May 26, 1994, but gave his oral confession on May 27, 1994 and his taped confession on May 28, 1994. He does not explain how there was any violation of the six hour rule here, as his statements were given subsequent to his

20. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

arraignment. There is no allegation of any statement having been made between arrest and arraignment which should have or could have been suppressed. We thus find no merit to the allegation that a violation of the six hour rule occurred in this matter.

We next turn to appellant's argument that police violated his right to counsel under the Fifth Amendment of the United States Constitution during all interrogations where counsel was not present, and, thus, that the suppression court erred by refusing to suppress his statements to police, (citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Commonwealth v. Santiago,* 528 Pa. 516, 599 A.2d 200 (1991)).

In *Santiago,* the defendant had been arrested for unlawful flight to avoid prosecution. After being advised of his Miranda rights, the defendant invoked the right to remain silent and requested an attorney. An attorney was appointed to represent him, and he was arraigned on this charge. Subsequently, while the defendant remained in custody on the unlawful flight charge, detectives sought to interview him regarding a murder. Defendant indicated his willingness to speak to police, and, even after being apprised of his *Miranda* rights, consented to the interrogation in writing and gave a statement admitting that he had committed the murder. The defendant then argued that police improperly initiated custodial interrogation after he had invoked his right to counsel, in violation of the Fifth and Fourteenth Amendments of the United States Constitution, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Edwards, supra,* and *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

In considering the appeal in *Santiago,* we summarized the holdings in these cases as follows:

[i]n *Miranda,* the United States Supreme Court determined that in order to protect the Fifth Amendment privilege against self-incrimination from the inherently compelling pressures of custodial interrogation, "[i]f an individual states

that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 473, 86 S.Ct. at 1628, 16 L.Ed.2d 694. In *Edwards,* the Court determined that additional safeguards for the Miranda right to counsel were necessary and held that once a suspect asserts the right, he may not be further interrogated "until counsel has been made available to him, . . . ." 451 U.S. at 484, 101 S.Ct. at 1885, 68 L.Ed.2d 378. Recently, in *Minnick,* the Court clarified the Edwards rule by holding that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153, 111 S.Ct. at 490, 112 L.Ed.2d at 498.

*Santiago,* 528 Pa. at 519–20, 599 A.2d at 201.

We held in *Santiago* that where a defendant had requested and received counsel immediately upon arrest for one offense, and the police subsequently initiated custodial interrogation concerning other unrelated offenses without presence of counsel, the defendant's Fifth Amendment right to counsel was violated. In reaching this conclusion, we ruled that the defendant had unquestionably invoked his Fifth Amendment right to counsel in response to his initial interrogation, and that this invocation of the right to counsel was non-offense-specific (citing *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)), and barred officials from interrogating him regarding any other offense without the presence of counsel.

In the present matter, appellant testified at the suppression motion hearing that he had been read his rights on May 27, 1994 prior to his arraignment, and that afterwards, he had requested legal counsel on May 27, 1994 before giving his confession, but was advised by the troopers that it would not help him. (N.T. 1/31/95, at 72–73) Appellant, however, could not recall which officer he had advised that he wished legal counsel, and admitted to signing the *Miranda* waiver card on May 27, 1994. (N.T. 1/31/95, at 74–75) Corporal Latsha testified that he had advised appellant of his *Miranda* rights and witnessed appellant's signature on the waiver card, and

that at no time had appellant requested to speak with an attorney. (N.T. 1/31/95, at 79–80) The suppression court found appellant's testimony totally lacking in credibility, and found that the testimony of each of the troopers who had interrogated appellant showed that appellant was neither confused nor coerced, but willingly gave his statements to police, and that each of the interviews with appellant at which he gave incriminating statements was preceded by a recitation of *Miranda* warnings to appellant. Thus, the court refused to suppress appellant's statements.

Upon a review of the testimony and rulings of the suppression court, we find the record supports the findings of the suppression court. *See Queen, supra.* Unlike the situation in *Santiago* or *Edwards*, there is nothing credible in the record here which would suggest that appellant invoked his Fifth Amendment right to counsel. We therefore affirm the suppression court.

■ Appellant next argues that the trial court should have sustained his objection to a death qualified jury. There is no merit to this argument, as both the United States Supreme Court and this court have struck down this challenge to the constitutionality of "death qualified" juries, and held the death qualification process is consistent with the guarantees of a trial. *See, e.g., Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568 (1992).

Next, appellant argues that the trial court improperly admitted into evidence certain color and black and white photographs depicting the dead body of the victim. Further, appellant contends that the trial court erred by admitting into evidence greatly enlarged photographic slides depicting the body of the victim. Appellant also asserts that a videotape of the crime scene depicting the body of the victim on the floor, which was shown to the jury in black and white and without sound, as well as a floor plan of the crime scene depicting in

detail the location of the victim's body, had prejudicial impact which outweighed their probative value.

 We have previously explained:

[p]hotographs of a murder victim are not *per se* inadmissible. It is the manner in which the corpse is displayed that causes photographs to be emotionally charged. The admission of such photographs is a matter within the discretion of the trial judge. The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. First a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

*Chester*, 526 Pa. at 591–92, 587 A.2d at 1373–74 (citations omitted). Only an abuse of discretion on the part of the trial judge will constitute reversible error. *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547 (1982).

 The trial court conducted an in-chambers review of each photograph offered and instructed the jury about the nature of the photographs which were ultimately admitted. Moreover, the jury was only permitted to review the photographs for a limited time. While the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory. *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994). We find no abuse of the trial court's discretion as to admission of these photographs.

 The enlarged photographic slides were used during the forensic pathologist's testimony and allowed all jurors to see the injuries being discussed so that they could remain focused on the forensic pathologist's testimony without the distraction of passing smaller photographs. We find no abuse

of the trial court's discretion as to admission of these exhibits.[21]

■ The floor plan showed the position of the victim and was not inflammatory but was probative as to how the shooting occurred. The trial court did not abuse its discretion in admitting this floor plan into evidence. *See Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987)(neutral sketches of position of homicide victim's body when discovered not inflammatory but proper visual aid for jury); *Commonwealth v. Morgan*, 448 Pa. 494, 295 A.2d 77 (1972) (diagrams showing location and measurements of rooms which figured into shooting properly admitted to aid jury).

Appellant asserts that the trial court improperly denied his motion for a mistrial and his motion for severance made after counsel for co-defendant referred to appellant by name in his opening statement.

■ In addressing appellant's allegation of error, the appropriate standard is the harmless error test set forth in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). *See Bond, supra.* An error is harmless "only when in light of the overwhelming evidence of guilt it was so insignificant that it could not have contributed to the verdict." *Bond*, 539 Pa. at 313, 652 A.2d at 314.

■ Co-defendant's counsel stated in his opening statement:

Kirchoff stated that he was on his way back into the house and trying to talk Kevin out of it, referring to something bad, when he heard the shots.

(N.T. Vol. 1, at 90) There was no prejudice from this reference to appellant by name. All three co-conspirators admitted their involvement in the conspiracy which resulted in the

---

**21.** For this same reason, we find no merit to appellant's argument that the prejudicial value of these photographs and enlarged slides of the victim's body outweighed any evidentiary value, and, consequently, that the trial court improperly permitted them to be displayed to the jury during the penalty phase. We note that the trial court gave the jury a special cautionary instruction as to the photographs at this point in the trial. (N.T. Vol. II, at 910).

killing. Appellant admitted he pulled the trigger. Moreover, the trial court cautioned the jury that arguments of counsel were not evidence. In light of the overwhelming evidence of appellant's guilt, this reference to his name in co-defendant's opening statement was so insignificant that it could not have contributed to the verdict.

■ Next, appellant contends that he was unable to effectively cross examine prosecution witness Nathan Reigle, in violation of his constitutional rights under the Confrontation Clause,[22] because the trial court denied his request to have the Commonwealth provide Reigle's juvenile record.

This court has stated:

> In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court held that "the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness's probationary status as a juvenile delinquent." *Id.* at 309, 94 S.Ct. at 1107, 39 L.Ed.2d at 349. Relying on *Davis*, this Court in *Commonwealth v. Simmon*, 521 Pa. 218, 555 A.2d 860 (1989), held that "the juvenile record of a prosecution witness must be made available to the defense for the purpose of allowing the defense to determine whether there is anything in the witness's [sic] juvenile record which would indicate that the witness might be biased against the defendant and in favor of the prosecution."

*Commonwealth v. Murphy*, 527 Pa. 309, 311–312, 591 A.2d 278, 279 (1991).

Nathan Reigle's juvenile record was disclosed by the trial court to counsel for both defendants, including the fact that Reigle was currently on juvenile probation. Further, Reigle's juvenile probationary status and possible bias or agreements

---

**22.** Appellant relies on both *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *Commonwealth v. Simmon*, 521 Pa. 218, 555 A.2d 860 (1989), but does not specify whether his objection is under the United States Constitution, the Pennsylvania Constitution, or both constitutions.

with the prosecution were brought out at trial by the Commonwealth. There is thus no merit to appellant's contention that he was denied an opportunity to confront the prosecution's witness.

In his next argument, appellant asserts that the trial court improperly denied his motion to prevent Mark from presenting testimony known to the Commonwealth to be untrue and/or untrustworthy. Appellant contends that the Commonwealth knew Mark's testimony was untrustworthy because he failed to pass a polygraph test, passage of which was a condition of Mark's entry of a guilty plea to third degree murder. Appellant asserts that when Mark did not pass this polygraph test, the Commonwealth later entered a deal with Mark whereby he entered a guilty plea to second degree murder/life imprisonment, without parole, in exchange for his testimony.

The issue as to Mark's testimony was one of credibility. The results of the polygraph examination taken by Mark would not be admissible into evidence because of their lack of scientific accuracy. *Commonwealth v. Johnson*, 441 Pa. 237, 272 A.2d 467 (1971).

Further, appellant objects to the Commonwealth's use at trial of a drawing of the victim's residence done by Mark subsequent to his arrest. This drawing depicted the relative positions of the victim's back door to the kitchen, lights, doorway, steps, and the victim's stereo. We find no merit to appellant's contention. This drawing was merely tangential to the issues in this matter, and its admission had no prejudicial effect. The trial court did not abuse its discretion in admitting this drawing into evidence. *See Morgan, supra; Crawley, supra.*

Appellant next asserts that the trial court improperly denied his in-chambers motion for mistrial made after Mark, while on the witness stand and in the presence of the jury, demanded to stop testifying and indicated that his testimony was untruthful.

While Mark was testifying on direct examination by the prosecution, the following exchange occurred:

[THE PROSECUTOR]: When Kevin came out to the car at the end, after the end of the episode at Dumchock's house, you were in the car waiting; what did he say?

THE WITNESS: He said he had to shoot him.

Q. How did you react? What did you say?

A. I just said—

THE COURT: Just a minute.

JUROR No. 10: Could he speak up a little bit please?

THE COURT: Yes. Speak into the mike.

[THE PROSECUTOR]: You're going to have to speak loudly. The Court has directed you to speak loudly. Speak loudly. How did you react?

THE WITNESS: I'm done speaking loudly for everybody. I'm not going to sit up here and lie for everybody and everything else. Irv, do you want to take me back to jail?

THE COURT: Just a minute. You have to answer the question.

THE WITNESS: Take the deal, you can wipe your a— with it. I am not answering anymore questions. I'm going back to jail.

THE COURT: We'll take a recess, 15 minute recess. Jurors, leave the courtroom. Spectators remain seated.

(N.T., Vol. I at 485)

A mistrial is warranted where the incident upon which the motion is based is of such a nature as to deny the defendant a fair trial. *Commonwealth v. Bracey*, 541 Pa. 322, 341, 662 A.2d 1062, 1071 (1995). It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted. *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007 (1980).

When Mark's testimony resumed, each party's counsel had an opportunity to question him as to his outburst and the truthfulness of his testimony, and Mark indicated that he had

not been lying during his testimony prior to his outburst. (N.T. Vol. I, at 497, 502, and 522). It was then upon the jury to determine the credibility of Mark's testimony in light of his outburst.[23]

We conclude that Mark's outburst did not deny appellant a fair trial. Indeed, Mark's outburst was prejudicial to the Commonwealth, if anyone, because it suggested to the jury that the Commonwealth had elicited false testimony from Mark. In light of counsel's subsequent exploration of whether Mark's testimony prior to this outburst had been truthful, we find no abuse of the trial court's discretion in denying appellant's motion for mistrial.

■■■ Appellant also claims that the trial court improperly denied his motion for a mistrial made after Mark, while sequestered during a recess in his testimony following his outburst on the stand, was allegedly permitted to confer with his counsel in the sheriff's holding cell for over two hours outside the court's presence. Appellant contends that the effect of this meeting between Mark and his counsel was the same as if Mark had violated his sequestration order, in that Mark was able to consider his testimony and discuss it with counsel before returning to the stand.

■■■ Whether there has been a violation of a sequestration order is a question of fact for the trial court and this determination will not be overturned on appeal if the determination is supported by sufficient credible evidence. *See Commonwealth v. Stinnett*, 356 Pa.Super. 83, 514 A.2d 154 (1986). If a violation of a sequestration order is found, the remedy is a matter left to the discretion of the trial court, and, it is within the sound discretion of the trial court whether to allow the witness to testify with the proper cautionary instruction.

**23.** We have often stated that it is the function of the factfinder to pass upon the credibility of witnesses and the weight accorded to the evidence. The factfinder is free to believe all, part or none of the evidence.
*Commonwealth v. Duncan*, 473 Pa. 62, 68, 373 A.2d 1051, 1053 (1977) (citations omitted).

*Commonwealth v. Smith,* 464 Pa. 314, 346 A.2d 757 (1975); *Commonwealth v. Martin,* 440 Pa. 150, 269 A.2d 722 (1970).

During the recess which followed Mark's outburst, Mark, who had been a sequestered witness, was taken to a separate location in the courthouse in order to ensure that he had no contact with any of the interested parties to the trial. The trial judge explained to counsel on the record in chambers that he had allowed Mark to speak with his own counsel during this recess in order for the trial court to ascertain whether Mark had been adequately advised and counseled as to his Fifth Amendment right to remain silent and its potential impact upon his plea agreement pursuant to which he was required to testify. It was incumbent on the court, after the circumstance arose where Mark may have invoked his right to remain silent, to ascertain whether Mark had indeed invoked that privilege and whether he had raised it in a valid fashion (citing *Commonwealth v. Fava,* 503 Pa. 365, 469 A.2d 597 (1983)). Based on trial counsel's representations, the trial court was satisfied that Mark desired to proceed with his testimony and to retake the stand. As to the sequestration order, the trial court found no violation, since the court received assurances from Mark's counsel that they were the only persons who had access to him during this recess and that his testimony was not discussed. (N.T. Vol. I, at 485–496)

We agree with the trial court that there was no violation of Mark's sequestration order here.

Appellant next asserts that co-defendant Kirchoff's redacted statement implicating appellant remained powerfully incriminating against appellant, thus violating his right to confrontation set forth in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Neither appellant nor his co-defendant testified at their joint trial, but Trooper Bramhall testified as to each of their statements, redacting these statements to refer to the respective co-defendant as the "other guy".

In *Bruton,* the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation

Clause of the Sixth Amendment of the United States Constitution when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial. Subsequent to *Bruton,* however, we have approved the process of redaction whereby the names of co-defendants are deleted from each of the others' confessions in joint trial situations. *Bond, supra; Commonwealth v. Wharton,* 530 Pa. 127, 607 A.2d 710 (1992); *Commonwealth v. Johnson,* 474 Pa. 410, 378 A.2d 859 (1977).

> We stated in *Bond,*
>
> Admittedly, the redacted confessions along with the other evidence presented may reasonably lead the jury to infer that the "other guy" referred to within the confession of one defendant is obviously the codefendant. This Court recognizes that where the jury can infer that the redacted confession implicates the defendant, the defendant's rights under the confrontation clause are implicated. However, not all violations of the accused's right to confront his witnesses results in reversible error. The appropriate standard for review under these circumstances is the harmless error test as set forth in *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). *Commonwealth v. Chestnut,* 511 Pa. 169, 512 A.2d 603 (1986) (violation of a defendant's right to confrontation occurring through the admission of a codefendant's redacted confession is subjected to harmless error analysis).

*Id.* at 312, 652 A.2d at 314.

The error alleged by appellant here is that redaction had the effect of emphasizing the incriminating statements. We find that in view of the overwhelming evidence against appellant in this matter and the trial court's repeated instructions to the jury that the statements were to be used only against the person who made them, the trial court's admission of these redacted statements, if error at all, was harmless error at best.

The next several issues relate to the trial court's charge to the jury. First, appellant contends that the trial court erred

in not instructing the jury properly on the aggravating circumstance of torture. The trial judge charged the jury as follows:

> [t]he second alleged aggravating circumstance is that the offense was committed by means of torture. For a person to commit First Degree Murder by torture he must intend to do more than kill his victim. He must intend to inflict a considerable amount of pain and suffering on the victim which is unnecessarily heinous, atrocious or cruel, manifesting exceptional depravity. One acts with intent if it is his conscious object to cause a particular result.

(N.T. Vol. II, at 956)

This charge conforms to the language approved by this court in *Edmiston, supra.* We thus find no merit to appellant's argument on this issue.

■ Appellant next argues that the trial judge should have charged the jury on voluntary intoxication because there was evidence in this case that appellant had consumed alcohol prior to the Dumchock killing.

■ We have stated:

> In order to be entitled to a charge of voluntary intoxication . . ., there must be evidence in the case sufficient to place appellant's mental condition in issue. . . . The evidence must show that appellant was so "overwhelmed or overpowered by [drugs] to the point of losing his faculties or sensibilities" at the time the crime was committed.

*Commonwealth v. Marshall,* 534 Pa. 488, 497–98, 633 A.2d 1100, 1104–05 (1993) (citation omitted).

Although there was testimony of alcohol consumption prior to the killing in this matter, there was no evidence that appellant was overwhelmed or overpowered by alcohol. This evidence, thus, did not meet the requisite standard for the court to instruct the jury as to the effect of voluntary intoxication on the degree of murder.

■ Finally, appellant asserts that it was prejudicial error for the trial court to give separate charges for first and second degree murder and to refer to the impact of appellant's guilt

in the charges regarding the proof needed to convict co-defendant Kirchoff. Moreover, appellant urges that the trial judge's charging the jury on accomplice liability with regard to codefendant Kirchoff, but not appellant, had the effect of directing the jury to find appellant guilty of first degree murder while considering Kirchoff as an accomplice. Appellant argues that the jury charge as a whole had the general effect of directing the jury that they could find appellant guilty of nothing less than first degree murder.

 "A verdict will not be set aside if the instructions of the trial court, taken as a whole, and in context, accurately set forth the applicable law." *Bracey*, 541 Pa. at 335–36, 662 A.2d at 1068.

The trial court instructed the jury separately as to each defendant on first degree murder and second degree murder because of the question as to whether appellant used a deadly weapon on a vital part of Dumchock's body. The trial court instructed the jury as to accomplice liability regarding Kirchoff's participation in the killing because only Kirchoff, and not appellant, was charged as an accomplice to the killing.

Our review of the trial court's instructions reveals that the trial court accurately set forth the applicable law as to all degrees of murder as well as accomplice liability, leaving the degree of murder to the jury to determine for each defendant. *See Commonwealth v. Joseph*, 451 Pa. 440, 304 A.2d 163 (1973); *Commonwealth v. Gibbs*, 366 Pa. 182, 76 A.2d 608 (1950). We find no merit to appellant's arguments.[24]

24. We note that appellant also contends that the trial court improperly denied his motions for severance and mistrial prior to summation, asserting a cumulative effect of the prejudice from the trial court's denial of his motion for severance discussed *supra*. Appellant's request for severance and mistrial at this stage of the trial was based on the trial court's intention to give a separate instruction as to each of the co-defendants. Having found no merit to appellant's previous issues, we likewise find no merit to these issues. Moreover, we find no merit to his contention that he should be granted a new trial or arrest of judgment because of the cumulative effect of the errors he alleges occurred in this trial.

■ Pursuant to 42 Pa.C.S. § 9711(h)(3), we have the duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Upon conducting this review, we find that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. We also find that the evidence was sufficient to establish the two aggravating factors found by the jury. The jury found as the aggravating circumstances that defendant committed the killing while in the perpetration of a felony, and that defendant committed the offense by means of torture. 42 Pa.C.S. § 9711(d)(6) and (8).

Additionally, we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts in accordance with the requirements set forth in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), and have performed an independent review of the cases involving the sentence of death to determine whether appellant's sentence of death was proportional to the sentences imposed in similar cases, taking into consideration both the circumstances of the offense and character and record of appellant. After conducting this review in the present appeal, we find the sentence imposed upon appellant to be not excessive or disproportionate to the sentence imposed upon defendants in similar cases.

Accordingly, we affirm the convictions and judgments of sentence imposed on appellant, Kevin Marinelli, by the Court of Common Pleas of Northumberland County.[25]

---

25. The Prothonotary of the Supreme Court is directed to transmit, within ninety (90) days, the full and complete record of the case *sub judice* to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

Judgments of sentence affirmed.

NIX, former C.J., did not participate in the consideration or decision of this matter.

NIGRO, J., concurs in the result.