**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Samuel Henry FUNK, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued April 5, 2011.
Filed Aug. 26, 2011.

Michael S. Goodwin, Chalfont, for appellant.

Stephen B. Harris, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, BOWES, PANELLA, DONOHUE, SHOGAN, MUNDY, OTT and FREEDBERG, JJ.

OPINION BY OTT, J.:

Samuel Funk appeals, *nunc pro tunc*[1] by permission of the trial court, from a judgment of sentence entered on January 15, 2009, and denial of post-sentence motions, by operation of law, dated March 27, 2009. On January 15, 2009, a jury found Funk guilty of murder in the first degree, possessing an instrument of crime (PIC), theft by unlawful taking or disposition, and receiving stolen property.[2] He was immediately sentenced to life in prison without parole and an aggregate term of 16½ years' to 33 years' consecutive time for the remaining counts.[3] Post-sentence and supplemental post-sentence motions were filed raising several issues including ineffective assistance of counsel. The motions were denied by operation of law, and following a grant of *nunc pro tunc* relief, this appeal followed.

On appeal, Funk raises the following issues: 1) whether the trial court erred in admitting, over defense objections, enlarged pictures of the victim's body and her injuries, 2) whether the trial court erred in admitting evidence of prior wrongdoing through the testimony of victim's mother and police, 3) whether trial counsel provided ineffective assistance of counsel by denying Funk his right to testify at trial, and 4) whether trial counsel provided ineffective assistance of counsel by adopting the defense of heat of passion against the instruction of Funk.

This Court granted *en banc* review on January 6, 2011, and this matter is now ready for resolution. Based on the following, we affirm the judgment of sentence and dismiss Funk's ineffectiveness claims without prejudice for him to pursue on collateral review.

The trial court aptly summarized the facts and procedural history in its Pa. R.A.P. 1925(a) opinion as follows:

On the evening of February 10, 2007, an anonymous 911 call was placed from the Band Box Bar, stating that there was a dead body located in apartment E7, Aspen Falls Apartment Complex located in Falls Township, PA. Officers were dispatched to the apartment and knocked on the door and windows, but received no response. After contacting the maintenance man to gain entry to the apartment, the officers noted blood drippings in the kitchen and bathroom of the one bedroom apartment and discovered the body of thirty-six year old Jacqueline Goulding, dressed in a white bathrobe, laying face up on the bedroom floor. The walls and floor of the bedroom had bloodstains on them as well as the victim's bathrobe and hair. The victim had stab wounds on her chest, deep slashing cuts on her hands and foot, and bruising and swelling to the face.

After discovering the victim's body, officers secured the scene and sent an additional officer to the Band Box to conduct a further investigation. A door-to-door canvas of the apartment complex and a vehicle canvas of the cars in the parking lot was conducted, as well as a search of the surrounding area for the murder weapon.

. . .

---

1. Funk was granted permission to file *nunc pro tunc* because of a failure of the clerk of courts to enter a denial of post-sentence motions by operation of law after 120 days had passed for the trial court to decide the motions pursuant to Pa.R.Crim.P. 720(B)(3)(a) and (c).

2. 18 Pa.C.S. § 2502(a), 18 Pa.C.S. § 907(a), 18 Pa.C.S. § 3921(a), and 18 Pa.C.S. § 3925(a), respectively.

3. After hearing on supplemental post-sentence motions, the trial judge vacated the sentence on the receiving stolen property count and resentenced Funk to no further penalty.

The bartender at the Band Box testified that [Funk] entered the bar around 6:45pm on February 10, 2007. [Funk] used the pay phone at the bar to place a call and seemed agitated. When asked if he had used the pay phone to call 911, [Funk] stated that he did not, but rather he was talking to his girlfriend. After [Funk] was informed that the police were on their way, he "got up and left in a hurry."

At approximately 3:30pm on February 11, 2007, an off-duty officer reported that he located what appeared to be the victim's vehicle, parked at the Edgley Inn on Route 13. Two officers arrived at the Edgley Inn and confirmed that the vehicle belonged to the victim. As they then began to walk toward the entrance of the building, the observed a man they recognized as [Funk] exiting the establishment and walking in the direction of the vehicle. The officers placed [Funk] under arrest and noticed dark red stains on the outside of his coat, on his sweatpants, and on the top of his shoes. The officers also observed a deep cut on the inside of [Funk's] right wrist, which they bandaged. During this time, [Funk] stated, "I didn't mean to do it. She attacked me so I retaliated." [Funk] was searched and officers discovered a key to a Ford vehicle; it was later determined that this key operated the victim's vehicle. A search of that vehicle revealed boxes of men's clothing, beer, a wallet belonging to [Funk], and a credit card belonging to the victim. Swabs were taken from the center console and steer [sic] wheel of what appeared to be blood.

[Funk] was transported to the Fall Township Police Department and was placed in an interview room. The officer assigned to watch [Funk] described him as "very chatty." [Funk] stated that the victim had stabbed him, and he lifted his shirt to reveal superficial cuts on his torso. The officer also noted that [Funk]'s right wrist was bandaged, he had a cut on his left wrist, and [Funk] stated that he believed his hand was broken.

Detective Whitney and Detective McClintic were responsible for interviewing [Funk]. Immediately, [Funk] stated, "I did a terrible thing. I killed the girl that I love, the woman I was going to marry, the woman I was going to spend the rest of my life with." Detectives then stopped [Funk], went through the *Miranda* procedure, and [Funk] signed the form waiving his rights and indicating his wished [sic] to continue talking without a lawyer present. [Funk] proceeded to tell the detectives that he and the victim got into a fight on February 10, 2007 because the victim told [Funk] that she had given her phone number to a man at the bar that evening. The fight carried over to the next morning and at some point, the victim went into the kitchen, got a knife, returned to the bedroom, and stabbed [Funk] in the stomach while he was sitting on the bed. [Funk] stated that he jumped up and she stabbed him in the stomach again. He then grabbed the victim, threw her against the wall, and she stabbed him a third time. He tried to punch her, and at that time, he received a cut to his wrist. He then hit her in her head, she fell to the floor, and he went to the kitchen to attend to his wounds. When he returned to the bedroom a short time later, [Funk] saw the victim on the floor, with a knife in her chest. He stated that he asked her if she was ok, but received no response. He walked over, pulled the knife out of the victim's chest, checked for a pulse, and when he couldn't find one, he took the knife and left. [Funk] stated that he

believed the knife went into her when he grabbed her. Detective Whitney, who was present while the crime scene was being processed, testified that he told [Funk] that his account of the events was not consistent with what they observed at the scene. [Funk] then gave the detectives two more versions of the story, all beginning with the victim stabbing [Funk] three times followed by a struggle during which the knife somehow ending up in the victim's chest.

At the trial, the victim's mother, Maria Jenkins, testified as to the nature of the relationship between [Funk] and the victim. The victim had moved back into her parent's house at the beginning of her divorce proceedings. During that time, Ms. Jenkins observed a large number of calls coming in from [Funk] to the victim, sometimes as many as fifteen calls in a half hour. Ms. Jenkins described the voicemails left by [Funk] as angry and controlling. She also described an encounter where she met [Funk] in person at the victim's apartment and [Funk] was acting as if "he owned the place." Ms. Jenkins noted several other instances of [Funk]'s controlling behavior including forcing the victim to end her visit with her father in hospital sooner than she had intended and showing up uninvited to Christmas dinner. The day after Christmas 2006, the victim told Ms. Jenkins that she was going to break up with [Funk]. The victim stated that she rented a storage unit so she could move [Funk's] belongings out of the apartment. Ms. Jenkins made her promise that when she informed [Funk] about the storage unit, she would do it in a public place.

Officer Jeffery Omlor testified that he was sent to the victim's residence on November 23, 2006 as well as December 23, 2006 in response to a report of a domestic dispute in progress. Corporal Robert Bray also testified that he was dispatched to the victim's apartment to respond to a report of an unwanted person. When he arrived, the victim stated that she and [Funk] were fighting, and it became physical. There were no arrests made or charges brought for either incident.

. . .

Dr. Ian Hood, the doctor who performed the autopsy on the victim, testified that the injuries on the left and right side of the victim's face, head, and neck were consistent with being struck multiple times. Dr. Hood also stated that the victim had brain injuries indicative of being punched or hit in the head. The autopsy revealed defensive injuries on the victim's hands and forearms. The victim had two smaller stab wounds on her chest, which were consistent with the victim grabbing the knife to prevent it from going into her chest. Dr. Hood also testified that the victim's fatal wound was not consistent with falling on a knife, but it was consistent with a deliberate stab wound. Dr. Hood also testified that based on the images he saw of [Funk]'s injuries, the cuts suffered by [Funk] were more consistent with being self-inflicted than any other manner.

Trial Court Opinion, 11/24/2009, at 3–8, 9 (citations omitted).

■ The first issue raised on appeal is whether the trial court erred in admitting, over defense objections, enlarged pictures of the victim's body and her injuries. Our Supreme Court has held that photographs of a murder victim are not *per se* inadmissible and it is a decision within the sound discretion of the trial court. Only an abuse of discretion will constitute reversible error. *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 216–217 (1997).

■ The trial court must apply a two-part test prior to admitting photographs into evidence over objection by a party. First, the court must determine whether the photograph is inflammatory. *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122 (2007). This Court has interpreted inflammatory to mean the photo is so gruesome it would tend to cloud the jury's objective assessment of the guilt or innocence of the defendant. *Commonwealth v. Dotter*, 403 Pa.Super. 507, 589 A.2d 726 (1991). Next, if the trial court decides the photo is inflammatory, in order to permit the jury to view the photo as evidence, it must then determine whether it is has essential evidentiary value. *Eichinger*, 915 A.2d at 1142 (Pa.2007).

The photographs taken of the crime scene and autopsy depict a violent struggle. The victim had been struck forcibly many times, stabbed repeatedly, and had bruises and puncture wounds behind her ear and inside her mouth. It was determined that an eight-inch kitchen knife caused the fatal injury, a stab wound to the chest. The trial court permitted only certain photos to be shown to the jury. The court held these specific photographs were not so gruesome as to be inflammatory.

■ Additionally, the court reasoned that even if the chosen pictures were considered inflammatory, they were essential to establish proof in the case.[4] To prove murder in the first degree, the Commonwealth must prove intent. "An intentional killing is any . . . kind of willful, deliberate, and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon upon a vital part of the victim's body. The repeated use of a deadly weapon upon vital parts of the victim's body is sufficient to demonstrate a specific intent to kill beyond a reasonable doubt. *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 444 (2006).

Many assertions that Funk made about how the murder occurred were disproved by expert testimony using the pictures. While Funk claimed the victim was the attacker, the pictures showed defensive wounds on the victim. Funk claimed he had pulled the knife out of the victim only after she fell on it. Dr. Hood testified the blood splatter shown in the pictures evidenced the victim was deliberately stabbed. Funk's versions of the events were inconsistent with the violence depicted in the pictures. After review of the record, including the photos admitted at trial, we agree the pictures were essential for the Commonwealth to prove an intentional killing. Funk's first issue fails.

■ Funk's second issue is the trial court erred in admitting evidence of prior wrongdoing through the testimony of victim's mother and police.

■ Evidence of a prior bad act committed by a defendant is admissible to establish motive, intent, absence of mistake or accident, a common scheme or plan, and identity. In addition, the probative value of the evidence must outweigh any potential prejudicial effect. *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002) (citing *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 840 (1989)).

The victim's mother, Maria Jenkins, testified about the relationship between Funk and her daughter. Jenkins stated her observations of Funk's controlling behavior,

---

4. The trial court directed one picture, a close-up of the victim's bruised face, be shown only in black and white. The court ruled this picture was essential because the autopsy showed brain injury caused by the blows depicted. N.T., 1/15/2008, at 6–8.

specifically in telephone threats left on the victim's voicemail and in personal encounters she had with Funk in the victim's presence.

The testimony of Officer Jeffery Omlor and Corporal Robert Bray related how each, on prior occasions, had been dispatched to the victim's residence because of fights between Funk and the victim.

We agree with the trial court that the aforementioned testimony established intent and the absence of an accident as Funk had claimed. Moreover, the threat left on the voicemail established a motive, jealousy. We cannot conclude the trial court abused its discretion in permitting the admission of testimony as to Funk's prior bad acts. Funk's second issue fails.

■ Funk's third and fourth issues raise claims of ineffective assistance of counsel. Ineffective assistance of counsel claims are generally required to be raised only in collateral review. Our full Court recently addressed this issue in *Commonwealth v. Barnett*, 25 A.3d 371, 373–75 (Pa.Super.2011) (*en banc*). After an extensive review of the history of the issue of ineffectiveness claims being raised on direct appeal, a Majority of this Court concluded,

> Based on the opinion of a majority of participating justices in [*Commonwealth v.*] *Wright* [599 Pa. 270, 961 A.2d 119 (2008)] and *Liston*, this Court cannot engage in review of ineffective assistance of counsel claims on direct appeal absent an "express, knowing and voluntary waiver of PCRA review." *Liston*, 602 Pa. at 22, 977 A.2d at 1096 (Castille, C.J., concurring). With the proviso that a defendant may waive further PCRA review in the trial court,[16] absent further

instruction from our Supreme Court, this Court, pursuant to *Wright* and *Liston*, will no longer consider ineffective assistance of counsel claims on direct appeal.

---

[16] This matter was referred to the Criminal Rules Committee by the Supreme Court in *Liston*. *Liston*, 602 Pa. at 29–30, 977 A.2d at 1100–01 (Castille, C.J., concurring). Chief Justice Castille wrote as follows:

There is no reason, consistent with the PCRA, to authorize trial courts to arbitrarily permit an extra round of collateral attack for some but not all defendants; no rational, fair rule of limitation has been offered to warrant placing our imprimatur upon this unauthorized extension of [*Commonwealth v.*] *Bomar* [573 Pa. 426, 826 A.2d 831 (2003)]; and this Court has the exclusive power to supervise such procedural matters. We should take the bull by the horns and correct the problem now.[13]

[13] In light of the expressions by a majority of the Court in *Wright*, and a majority of the Court in this case, I would refer this matter to the Criminal Procedural Rules Committee with directions to consider and recommend measures to account for the identified concerns with whether, and under what circumstances, hybrid, unitary review should be permitted on post-verdict motions. I have been authorized to state that Madame Justice Greenspan agrees that the matter should be referred to the Criminal Procedural Rules Committee.

*Id.*

*Commonwealth v. Barnett*, 25 A.3d 371, 373–75 (Pa.Super.2011).

A hearing was held on Funk's post-sentence motions, including the claims of ineffectiveness; however, the trial judge did not dispose of the issues on the merits[5] and on March 27, 2009, Funk's post-sentence motions were denied as a matter of law. The evidentiary issues are properly raised on direct appeal. However, we are bound by the holding of *Barnett* and the

---

**5.** The Honorable Mitchell S. Goldberg received his commission to the United States District Court, Eastern District of Pennsylvania, on October 31, 2008. The Honorable

Wallace H. Bateman, Jr., wrote the Pa.R.A.P. 1925(a) opinion without the benefit of personally observing the witnesses' testimony.

ineffectiveness claims will not be considered at this time. Therefore, we dismiss these claims with no prejudice to Funk, who may raise them, as well as any additional PCRA claims, in a timely filed PCRA petition.

Judgment of sentence affirmed.