J-S79036-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| EMMANUEL DURAN, | : | |
| | : | |
| Appellant | : | No. 1776 EDA 2015 |

Appeal from the Judgment of Sentence May 15, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s):  CP-51-CR-0010357-2013

BEFORE:  GANTMAN, P.J., MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:　　　　　**FILED DECEMBER 28, 2016**

Emmanuel Duran ("Duran") appeals from the judgment of sentence imposed after a jury convicted him of second-degree murder, robbery, burglary, conspiracy, and firearms not to be carried without a license.[1]  We affirm the convictions, vacate the separate judgment of sentence imposed for robbery, and affirm the judgment of sentence in all other respects.

The trial court thoroughly set forth the factual and procedural history underlying this appeal, which we adopt as though fully set forth herein.  **See** Trial Court Opinion, 12/8/15, at 2-21.

In this timely appeal, Duran presents the following issues for our review:

> A. Did the trial court commit an abuse of discretion when it [overruled Duran's] timely objection to permitting a [Commonwealth] witness to testify after the witness violated a sequestration Order?

---

[1] **See** 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 3502(c)(1), 903, 6106(a)(1).

B. Did the trial court commit an abuse of discretion and violate [Duran's] Sixth Amendment right when it denied [Duran's] timely *pro se* Motion to represent himself?

C. Did the trial court commit an abuse of discretion by permitting the Commonwealth to introduce evidence of a robbery that occurred the day after the crime herein was committed?

Brief for Appellant at 4 (capitalization omitted).

In his first issue, Duran argues that the trial court committed reversible error when it permitted one of the Commonwealth's witnesses, Myron Baker ("Baker"), to testify, over Duran's objection, after Baker had violated a sequestration Order pertaining to all Commonwealth witnesses.[2] *Id.* at 15. Duran argues that "the violation of sequestration by [] Baker was serious and had a deleterious effect on the trial[;] … it is clear that Baker's testimony [] could have been influenced and conformed by [Brooks's] testimony[, which Baker] heard while inside the court[]room." *Id.* at 17; *see also id.* (asserting that "[t]he Commonwealth's case primarily was predicated on Brooks'[s] testimony").

The trial court addressed this claim in its Opinion, concisely summarized the relevant law, and determined that the court did not err in permitting Baker to testify despite the violation of the sequestration Order. *See* Trial Court Opinion, 12/8/15, at 21-23. The trial court's rationale is

---

[2] Baker violated the Order during trial, when he was present in the courtroom for a portion of the testimony of one of Duran's accomplices, Edward Brooks ("Brooks").

- 2 -

supported by the law and the record. Discerning no abuse of discretion, we affirm with regard to Duran's first issue based on the trial court's rationale. *See id.*; *see also Commonwealth v. Smith*, 346 A.2d 757, 760 (Pa. 1975) (holding that the trial court properly exercised its discretion in denying the defense's motion for a mistrial made following a violation of a sequestration order and permitting the Commonwealth witness to testify, where the witness's testimony was not altered by the violation of the sequestration order and the jury was made aware of the violation through cross-examination of the witness).

In his second issue, Duran contends that the trial court erred by denying his Motion to proceed *pro se*, where the court's reasons for the denial were legally insufficient and Duran's request was unequivocal. Brief for Appellant at 18, 28. According to Duran, he "proffered numerous[,] valid reasons as to why he should have been permitted to proceed as his own counsel." *Id.* at 27 (citing N.T., 4/20/15, at 132-35).[3] Duran further argues that the trial court erred in failing to "conduct a colloquy of [Duran] to ascertain whether he was capable of representing himself and whether he

---

[3] We observe that the transcript from the hearing on April 20, 2015 is not contained in the certified record concerning Duran's case. *See Commonwealth v. Lopez*, 57 A.3d 74, 82 (Pa. Super. 2012) (stating that "it is an appellant's duty to ensure that the certified record is complete for purposes of review.") (brackets omitted). Nevertheless, we have obtained a copy of this transcript from the appeal of one of Duran's codefendants, Raheem Brown, which is also listed before this panel at No. 2963 EDA 2015.

was making that decision knowingly, intelligently and voluntarily." Brief for Appellant at 18-19.

The trial court thoroughly addressed this claim in its Opinion, set forth the relevant law, and determined that the court did not err in denying Duran's request to proceed *pro se*, which was equivocal and made because he wanted his appointed counsel to be replaced with new counsel. **See** Trial Court Opinion, 12/8/15, at 23-26; **see also Commonwealth v. Davido**, 868 A.2d 431, 440 (Pa. 2005) (holding that the trial court properly denied the defendant's equivocal request to proceed *pro se*, where the request was posed as a "bargaining device," and the defendant's only alternative if the court declined his request for the appointment of new counsel). We agree with the trial court's sound rationale and determination, and therefore affirm on this basis in rejecting Duran's second issue, **see** Trial Court Opinion, 12/8/15, at 23-26, with the following addendum.

Duran's claim that the trial court erred by allegedly failing to conduct a colloquy to address his request to proceed *pro se* does not entitle him to relief. "[F]or purposes of appellate proceedings, a court only needs to conduct an on the record colloquy when there has been a 'timely and *unequivocal*' request to proceed *pro se*." **Davido**, 868 A.2d at 438 (emphasis added). In the instant case, Duran's request was not unequivocal. Moreover, our review of the portions of the transcript from the April 20, 2015 hearing upon which Duran relies, **see** N.T., 4/20/15, at 132-

35), reveals no unequivocal request to self-representation.[4] ***See also*** Trial Court Opinion, 12/8/15, at 26 (wherein the trial court stated that, at the April 20 hearing, it had considered Duran's argument on his request to proceed *pro se*, as well as the remarks that he made "during [his] colloquy").

In his third issue, Duran argues that the trial court erred when it permitted the Commonwealth to introduce evidence that he (and two accomplices) had robbed Baker on the day after the shooting, armed with a revolver that was of the same type and caliber as that used in the shooting (hereinafter referred to as "the subsequent bad act evidence"). ***See*** Brief for Appellant at 28-41. Duran contends that the trial court erred in determining that this evidence was admissible, under Pennsylvania Rule of Evidence 404(b),[5] to prove Duran's identity as the shooter in the instant case. ***See*** Brief for Appellant at 33-39. According to Duran, "it is important

---

[4] Indeed, Duran stated only "I'm not happy with [appointed counsel's] representation." N.T., 4/20/15, at 135.

[5] Rule 404(b) provides, in relevant part, as follows:

> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, **identity**, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b) (emphasis added).

to note that the gun in question was not discovered in [his] possession by police[,] and more importantly, it was not tied to the crime herein. … Accordingly, … the [subsequent bad act] evidence was not admissible to prove identity …." **Id.** at 39. Duran asserts in the alternative that even if the subsequent bad act evidence was admissible under Rule 404(b), the trial court should have excluded it because the probative value of this evidence was outweighed by its prejudicial effect. **Id.** at 28, 41; **see also id.** at 35 (urging that the subsequent bad act evidence "should have been excluded because it merely showed a propensity for committing crimes").

Our standard of review concerning a challenge to the admissibility of evidence is as follows:

> The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

**Commonwealth v. Johnson**, 42 A.3d 1017, 1027 (Pa. 2012) (citations and quotation marks omitted).

The trial court addressed Duran's claim in its Opinion, summarized the applicable law, and determined that the court properly permitted the Commonwealth to introduce the subsequent bad act evidence to prove identity. **See** Trial Court Opinion, 12/8/15, at 33-35. As the trial court's

rationale and determination is supported by the law, we affirm on this basis as to Duran's third issue. *See id.*

Finally, we must address the legality of Duran's sentence, which matter we may raise *sua sponte*. *See Commonwealth v. Wolfe*, 140 A.3d 651, 659 (Pa. 2016); *see also Commonwealth v. Randal*, 837 A.2d 1211, 1214 (Pa. Super. 2003) (*en banc*) (stating that an illegal sentence must be vacated). Duran was convicted of felony murder, for which the predicate felony was the crime of robbery. The trial court sentenced Duran to life in prison on the second-degree murder conviction as well as a concurrent term of ten to twenty years in prison on the his robbery conviction. Pursuant to *Commonwealth v. Tarver*, 426 A.2d 569 (Pa. 1981), a sentencing court has no authority to impose a sentence for felony murder as well as a separate sentence for the predicate offense. *Id.* at 572-74 (holding that robbery is a "constituent offense" of second-degree murder and thus "same offense" under the double jeopardy test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932)); *see also Commonwealth v. Harper*, 516 A.2d 319, 321 (Pa. 1986) (stating that "for double jeopardy purposes, the underlying felony in a felony-murder prosecution is the 'same offense' as the murder; therefore, sentences for both the murder and the underlying felony are prohibited."). Accordingly, the crime of robbery merges with that of second-degree murder for sentencing purposes. We, therefore, affirm Duran's convictions, vacate the separate judgment of sentence imposed for

robbery, and affirm the judgment of sentence in all other respects. Because our decision does not affect Duran's aggregate sentence, a remand for resentencing is unnecessary. *See Commonwealth v. Henderson*, 938 A.2d 1063, 1067-68 (Pa. Super. 2007).

Judgment of sentence affirmed in part and vacated in part. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2016

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| COMMONWEALTH | : | CP-51-CR-0010357-2013 |
| | : | FILED |
| vs. | | DEC 0 8 2015 |
| | : | Post Trial Unit |
| | : | |
| EMMANUEL DURAN | : | SUPERIOR COURT<br>1776 EDA 2015 |

BRINKLEY, J.                                                   DECEMBER 8, 2015

## OPINION

Defendant Emmanuel Duran appeared before this Court for a jury trial and was found guilty of second-degree murder, conspiracy, robbery, burglary and violation of the Uniform Firearms Act (VUFA) 6106. This Court sentenced Defendant to a mandatory sentence of life without the possibility of parole on the second-degree murder charge, 20 to 40 years state incarceration on the conspiracy charge, 10 to 20 years state incarceration on the robbery charge, 10 to 20 years state incarceration on the burglary charge, and 3½ to 7 years state incarceration on the VUFA 6106 charge. The sentences on all charges were to run concurrently with one another. Defendant appealed the judgment of sentence to the Superior Court and raises the following issues on appeal: (1) whether this Court erred when it allowed a witness who had been present in the courtroom to testify; (2) whether this Court erred when it denied Defendant's motion to proceed *pro se*; (3) whether the evidence was sufficient to find Defendant guilty of all charges; (4) whether this Court erred when it allowed evidence of a subsequent bad act by Defendant.

1

## PROCEDURAL HISTORY

On July 13, 2013, Defendant was charged with murder, conspiracy, burglary, robbery and VUFA 6106. From May 5 to May 15, 2015, Defendant and co-defendant Raheem Brown ("Brown") were tried together in the presence of a jury. On May 15, 2015, Defendant was found guilty on all charges. On that same day, this Court sentenced him to a mandatory sentence of life without the possibility of parole on the second-degree murder charge, 20 to 40 years state incarceration on the conspiracy charge, 10 to 20 years state incarceration on the robbery charge, 10 to 20 years state incarceration on the burglary charge, and 3½ to 7 years state incarceration on the VUFA 6106 charge. The sentences on all charges were to run concurrently with one another. On June 12, 2015, Defendant filed a Notice of Appeal to the Superior Court. On July 7, 2015, this Court ordered defense counsel to file a Concise Statement of Errors Pursuant to Pa.R.A.P. 1925(b), and defense counsel did so on July 27, 2015. On August 4, 2015, this Court ordered that defense counsel be permitted to withdraw and that new counsel be appointed forthwith. On September 18, 2015, James Lammendola, Esquire, was appointed as appellate counsel. On September 29, 2015, this Court ordered appellate counsel to file a Concise Statement of Errors Pursuant to Pa.R.A.P. 1925(b) in the event that he wished to supplement the issues already raised in the Concise Statement of Errors filed by defense counsel on July 27, 2015. On October 13, 2015, after reviewing the Concise Statement of Errors already filed by defense counsel, appellate counsel adopted the issues raised therein without revising or supplementing them.

## FACTS

Trial began in this matter on May 5, 2015. Defendant was represented at trial by Earl Kauffman, Esquire, while the attorney for the Commonwealth was Jack O'Neill, Esquire. The Commonwealth called Wuyatta Fahnbulleh ("Fahnbulleh") as its first witness. Fahnbulleh

2

testified that she was with the decedent, Rush Thompson ("Thompson"), in his house on Trinity Street on November 8, 2009 and that she had been friends with him for roughly six months by that point. Fahnbulleh testified that, on that day, she was braiding a friend's hair when Thompson approached her at approximately 5:00 p.m. and told her that he wanted to spend the evening with her. Fahnbulleh further testified that she told Thompson that she would come over after she finished braiding her friend's hair and that she ultimately arrived at Thompson's house a little before 7:00 p.m. Fahnbulleh stated that Thompson's two sons were not home at the time and that they were alone in his house. Fahnbulleh testified that she and Thompson smoked crack cocaine together and had sexual intercourse. Fahnbulleh further testified that they were interrupted by the door bell, which Thompson went downstairs to answer. (N.T. 5/5/2015 p. 85-93).

Fahnbulleh testified that, roughly ten minutes after Thompson left to answer the door, she heard the television and radio suddenly become very loud and she screamed Thompson's name. Fahnbulleh further testified that, after she screamed, two males, one of whom was light-skinned while the other was dark-skinned and holding a gun, walked up the stairs towards her. Fahnbulleh stated that the light-skinned male told her to put on her clothes and to cover her eyes so she would not look at them. Fahnbulleh testified that, after she dressed, the light-skinned male took her downstairs and pushed her against the wall. Fahnbulleh further testified that she could hear Thompson pleading for his life and that he said to one of the males, "you're my cousin, we're family, don't do this to me." Fahnbulleh testified that the males continually asked Thompson where he kept his drugs and money and Thompson told them there were no drugs in his house. Id. at 93-94.

3

Fahnbulleh testified that one of the males sent another to search the house while they dragged her onto the floor beside Thompson and that she could hear them beat and choke him. Fahnbulleh testified that she believed there were three males present in Thompson's house, because when the two males brought her downstairs she could hear another male in the living room giving them instructions. Fahnbulleh stated that she never saw the third male, but only heard him, and that one of the men was wearing a pair of brown Timberland boots. Fahnbulleh testified that they asked her where the drugs were located but she told them she did not know. Fahnbulleh stated that she heard one of the males say, "let's go, there's nothing in this house," to which another of the males replied, "I'm not leaving without anything." Fahnbulleh testified that she then heard a "pow" sound and everything was quiet thereafter. Id. at 94-99.

Fahnbulleh testified that, when she next opened her eyes, she saw Thompson taking his last breath with blood coming from his head. Fahnbulleh further testified that she ran from the house and knocked on their neighbor's door but no one answered. Fahnbulleh testified that she ran towards another house and, when the occupants answered, she screamed, "they just shot [Thompson], they just shot [Thompson]". Fahnbulleh further testified that the inhabitants asked her whether she wanted them to call 911 and she told them to do so. Fahnbulleh further stated that she went to the house of a pastor she knew and, after she calmed down, she went to the police station. Fahnbulleh stated that the police took her to the Homicide Unit, where she gave a statement on November 9 at 6:23 p.m. Id. at 99-103.

Fahnbulleh testified that she gave a second statement to the police on March 13, 2010, at which time she was shown a photo array. Fahnbulleh further testified that she recognized the darker-skinned male who came upstairs with a gun and she circled his photograph. Fahnbulleh stated that the gun was a black semiautomatic gun with a barrel that was seven to eight inches in

4

length. Fahnbulleh testified that she smoked crack cocaine earlier in the day before meeting with Thompson, but her use of crack cocaine did not impair her ability to remember the event or perceive what was happening. Fahnbulleh further testified that she described the lighter-skinned male to police as "a black male, my complexion, my weight…between 5'6" to 5'9". He had strong cheek bones, probably between 27 to 30 years old…he had a black hat, something white on it. He had brown Timberlands…He had black jeans and a yellow sweater, colorful, like the one you knit, like homemade. Also [he] look[ed] like a baby face." Fahnbulleh further testified that one of the males told the other males "don't touch her, she ain't got nothing to do with it" after another had told him that she had seen their faces. Id. at 103-14.

The Commonwealth called Edward Brooks ("Brooks") as its next witness. Brooks testified that he was currently in prison after pleading guilty to Thompson's murder. Brooks further testified that he knew Thompson through his mother and that he used to live directly adjacent to Thompson's house at 1825 South 68th Street. Brooks stated that he used to go over to Thompson's house to play video games with him and that he bought marijuana on a daily basis from Thompson. Brooks testified that, on November 8, 2009, he went over to Thompson's house at about 1:00 p.m. to buy marijuana and that he went back that same day at around 7:00 p.m. with Defendant and Brown to rob Thompson. Brooks stated that he had earlier discussed robbing Thompson with Brown because he knew that Thompson sold drugs from his house and assumed he would have money. Brooks further stated that this conversation took place at Brown's house, which was across the street from his house, and that Defendant was not present for the conversation. Brooks testified that Defendant arrived at Brown's house a few minutes after the conversation ended and about ten minutes before they went to Thompson's house. (N.T. 5/6/2015 p. 11-19).

5

Brooks testified that he did not have a gun on him but Brown had a .45-caliber black semiautomatic gun while Defendant carried a .38-caliber revolver. Brooks further testified that he knocked on Thompson's door and that Thompson let the three of them into his house after he asked to buy drugs. Brooks stated that, shortly after they entered Thompson's house, Defendant and Brown drew their guns on Thompson. Brooks testified that Defendant told Thompson to lay down on the floor while Brown went upstairs and he searched the living room for drugs. Brooks further testified that Brown returned from upstairs with a woman and told her to stay in the corner. Brooks testified that he was at the bottom of the steps when the woman was brought down and that he grabbed her arm to place her in the corner. Brooks further testified that Defendant was on top of Thompson and told him to bring the woman to the dining room, which he did. Id. at 19-26.

Brooks testified that, while he and Brown continued to search the house, Defendant hit Thompson on the head with his gun and asked him "Where is it at?" Brooks further testified that Thompson told them that it was in the basement but, when he went to the basement to check, there was a pit-bull there so he returned to the living room and kicked Thompson in the head. Brooks further testified that he and Defendant then choked Thompson for a few seconds. Brooks stated that Thompson was not wearing a t-shirt and that the jeans he had been wearing had fallen down to his ankles. Brooks further stated that he and Defendant were both dressed entirely in black but he did not remember what Brown was wearing. Id. at 26-33.

Brooks testified that, after he finished searching the house, Brown came downstairs and told them they should leave. Brooks further testified that he replied they could not leave Thompson alive because Thompson knew him and he was afraid that Thompson would kill him in retaliation if they left him alive. Brooks stated that Brown told him that he would have to be

6

the one to kill Thompson and he replied that he was unable to do so because he had never killed anyone. Brooks further testified that, as he and Brown argued, Defendant shot Thompson once in the head using the .38-caliber revolver. Brooks stated that Defendant was crouched over Thompson when he shot him and that Thompson was motionless after he was shot. Brooks further stated that the three of them ran out of Thompson's house immediately afterwards. Brooks testified that he never touched a gun at any point during the robbery and that he never told his mother that he had. Brooks further testified that neither he nor Defendant went upstairs and he was unsure why the woman said that he did and that he had a gun. Id. at 33-38, 53-55.

The Commonwealth called Officer David Gerard ("Gerard") as its next witness. Gerard testified that he had worked in the 12th District for approximately 8 years and that he responded to a radio call in the area of Trinity Street at around 7:00 p.m. on November 8, 2009. Gerard further testified that the radio call stated that somebody had been shot inside a home and that, although the exact address was unknown, the front door to the house was left open. Gerard stated that he arrived at the location and observed that the front door of 6726 Trinity Street was open. Gerard further stated that he approached the property from the front steps while his partner proceeded to the rear of the property. Gerard testified that, immediately after entering the front door, he observed Thompson lying face down on the living room floor. Gerard further testified that Thompson's pants were down around his ankles and that, while he was not wearing a shirt, he had a white t-shirt covering his head which was partially soaked in blood. Gerard stated that, after he checked Thompson for vital signs, he searched the property but did not locate any other people inside the house. Gerard further stated that the medics arrived at the scene and together they rolled Thompson over and pulled him further into the living room. Gerard testified that, as they moved Thompson, he saw the projectile part of a bullet in a pool of blood where

7

Thompson's head had been laying. Gerard further testified that he searched the area for a fired cartridge casing but was unable to find any. Id. at 161-65.

The Commonwealth called Michelle Thomas ("Thomas") as its next witness. Thomas testified that she had been friends with Thompson and that Brooks was her son. Thomas further testified that, sometime after she learned that Thompson had been killed, the police came to her house for Brooks. Thomas stated that Brooks was in New York on a church retreat at the time so she called her brother to retrieve him and, when he returned to Philadelphia, he turned himself in to police. Thomas further testified that she asked Brooks why Homicide detectives were looking for him and, although he initially denied involvement, he eventually told her that he was involved in Thompson's murder. Thomas testified that Brooks told her that he went with two other men to Thompson's home and told Thompson that they wished to buy marijuana from him. Brooks further told her that, after Thompson let them into his home, the two men pulled out guns and robbed him. Brooks told her that one of the men gave a gun to him and told him that he had to kill Thompson, but he was unable to do it. Brooks further told her that when he gave the gun back to the man, the other man shot Thompson in the head and they ran out of the house. Thomas testified that Brooks told her that one of the other men was Brown, who lived across the street from them, but she did not know who the second man was. Id. at 172-80.

The Commonwealth called Myron Baker ("Baker") as its next witness. Baker testified that, at around 8 a.m. on November 9, 2009, three males came to his house. Baker further testified that the first male was 5'6", around 18 to 26 years old, light-skinned and had a tattoo on his lower arm, while the other two males were both approximately 5'8" to 5'10", around the same age as the first male and that one of the other males had a medium complexion while the other had a dark complexion. Baker testified that he was the lawful owner of two .40-caliber

8

firearms and that, when the males came to his house, he had one of the firearms, a .40-caliber Glock 27, in his waistband while the other one, a .40-caliber black and silver HK, was in his truck. Baker testified that the light-skinned male had a black .38-caliber revolver with a two to three inch barrel length while the other two males each had semiautomatic handguns. Baker further testified that the light-skinned male was wearing a black hooded sweatshirt and blue jeans while the other two wore dark hooded-sweatshirts and jeans. Baker stated that the males took his handguns from him and left. Id. at 206-14.

The Commonwealth called Officer Joseph Rapone ("Rapone") as its next witness. Rapone testified that he had been assigned to the Philadelphia Highway Patrol for 18 years and that, on June 9, 2010, he made a car stop in the 2800 block of North 5th Street. Rapone stated that, after stopping the vehicle for a violation, he was approaching the vehicle on foot when his partner yelled "gun". Rapone further stated that he observed the passenger in the left rear passenger seat, Joshua Hines ("Hines"), put a handgun in his pocket. Rapone testified that he immediately drew his firearm, took the gun from Hines then arrested him and placed him in the police car. Rapone further testified that Brown was sitting in the right rear passenger seat of the vehicle and that he took Brown out of the vehicle. Rapone stated that, as he searched Brown for weapons, his partner again yelled "gun" as he was searching the right front passenger, John Bowie ("Bowie"). Rapone testified that he let go of Brown, who subsequently fled southbound on 5th Street and westbound on Somerset before they lost him. Rapone testified that he recovered a .40-caliber Glock from Bowie and a .38-caliber Lady Smith revolver with a very small barrel from Hines. Rapone further testified that the revolver had four live rounds and one fired cartridge casing when it was recovered. Rapone stated that Brown was not apprehended that day and he did not recover any drugs from the car. Id. at 228-37.

9

The Commonwealth called Bowie as its next witness. Bowie testified that he was arrested on June 9, 2010 after the car he was travelling in with Brown and Hines was pulled over by the police. Bowie further testified that he had a Glock 27 semiautomatic handgun on him when he was arrested and that Hines had a .38-caliber Smith and Wesson revolver on him. Bowie stated that he did not remember Defendant or Brown admitting to him that they had committed a murder and that he told the police that they had so he could leave custody. Bowie further stated that Defendant and Brown could not have committed the murder because he killed Thompson, although he did not know Thompson's name. Bowie testified that Thompson was the only person in the house when he killed him and that he used the .38-caliber Smith and Wesson. Bowie further testified that he killed Thompson with the assistance of another male, although he did not know the male's name. Bowie stated that the male was 6' and had brown skin, but could not describe him further. Id. at 252-62.

Bowie testified that the other male knocked on Thompson's door and they entered his house after Thompson let them in. Bowie further testified that Thompson was older than him but could not describe him further. Bowie stated that he could not remember what color shirt Thompson was wearing, what kind of pants Thompson was wearing or what the inside of Thompson's house looked like. The Commonwealth then read from the statement Bowie gave to police on June 30, 2010. Bowie stated that on, June 9, 2010, he was stopped and arrested by the police for possessing a Glock 27 .40-caliber handgun that he did not have a permit to carry. Bowie further stated to the police that he received the Glock from Brown that morning. Bowie testified at trial that he remembered telling this to the police, but it was untrue as the gun was his own. Bowie testified at trial that he identified a photograph of Brown and that he told the police that Brown was sitting in the seat behind him in the car when it was stopped. Id. at 263-76.

10

In Bowie's June 30, 2010 statement to police, he stated that Defendant and Brown told him they had killed an older male inside a house in Southwest Philadelphia near Brown's house. Bowie further stated to the police that Brown told him they thought the man had marijuana in his house and that they used the .40-caliber handguns. Bowie testified at trial that he gave these answers to the police but he lied because he did not want to get charged with possessing the gun. Bowie stated to the police that, on the morning he was arrested, Defendant and Brown arrived at Defendant's sister's house with a .38-caliber revolver, a silver and black .40-caliber semiautomatic, a black .40-caliber Glock, and a .45-caliber ACP. Bowie further stated to the police that the .38-caliber gun was sold to a person named Diddy and that Defendant was arrested carrying the .40-caliber HK that came from Baker. Bowie testified at trial that he used the gun that Defendant and Brown had taken from Baker on November 9, 2009 to shoot Thompson on November 8, 2009. (N.T. 5/7/2015 p. 15-25, 30-31, 111-12).

The Commonwealth called Hines as its next witness. Hines testified that he was arrested in June 2010 while in a car with Bowie and Brown and that he gave a statement to the police on June 11, 2010. Hines stated to the police that he was arrested for carrying a revolver that Diddy had given to him. Hines further stated to the police that Defendant told him that he had killed a man inside a house in Southwest Philadelphia near Brown's house. Hines testified at trial that he remembered making that statement to the police but could not remember whether it was true because he was high on cough syrup at the time, despite earlier stating to the police that he was not under the influence of drugs or alcohol. Hines testified at trial that he identified a photograph of Defendant after he finished his statement and signed his name below the photograph. Hines testified at trial that he had written multiple letters to the District Attorney asking to retract his statement because he did not want to testify against his friends at trial. Id. at 137-63.

11

The Commonwealth called Gary Collins ("Collins") as its next witness. Collins testified that he worked at the Philadelphia Medical Examiner's Office from January 2007 to October 2014 as an assistant medical examiner and later the deputy chief medical examiner. Collins further testified that, after graduating from medical school, he did a five-year training program in pathology at the University of South Florida and a one-year training program in forensic pathology in Philadelphia. Collins stated that he was board certified in the area of anatomic, clinical and forensic pathology and that he had personally performed in excess of 2300 autopsies. Collins further testified that he had testified as an expert in the area of forensic pathology at least a few hundred times. Collins was subsequently offered and accepted by this Court as an expert in the field of forensic pathology. (N.T. 5/8/2013 p. 4-7).

Collins testified that he performed Thompson's autopsy on November 8, 2009. Collins further testified that Thompson was pronounced dead by the medics at the scene at 7:46 p.m. on November 8, 2009 and his body was subsequently transported to the Medical Examiner's Office. Collins testified that Thompson had suffered a perforating gunshot wound to the head and that no bullets were recovered from the body. Collins further testified that the entrance wound was located on the back left side of Thompson's head and the exit wound was on the front right side of his head just above his hairline. Collins stated that there was no soot or stippling found on Thompson's skin. Collins testified that Thompson was wearing a pair of jeans and socks, and that there was a blood-stained white t-shirt that accompanied his body. Collins further testified that there were holes in the t-shirt and gunfire residue adjacent to the holes. Collins stated that, if the shirt was wrapped around Thompson's head, then the residue would mean that the gun was within two inches to three feet of Thompson's head when it was fired. Collins further stated that

12

there were multiple holes in the shirt, which was consistent with the shirt being folded and one shot passing through it. Id. at 8-18.

Collins testified that Thompson tested positive for cocaine. Collins stated that Thompson had a small abrasion on the right side of his face and forehead and small scrapes just above his eyebrow. Collins further stated that Thompson had an area about two inches in size on his right cheek which was swollen and had two small scrapes. Collins stated that these abrasions were consistent with being struck by a blunt object. Collins testified that Thompson's injuries were consistent with a person standing or crouching over him and firing one shot through a t-shirt into the back of his head. Collins stated that, once Thompson sustained the gunshot wound, he would have been immediately incapacitated and capable of only small, involuntary movements. Collins further stated that it was possible that Thompson could have continued to breathe after sustaining the gunshot wound despite the damage to his brain. Id. at 19-25.

The Commonwealth called Abu Abdul Wakeel ("Wakeel") as its next witness. Wakeel testified that he lived near Trinity Street but could not recall knowing Brooks. Wakeel further testified that he could not recall giving a statement to the police about Thompson's death. The Commonwealth then read from the statement Wakeel gave to police on March 2, 2010. Wakeel stated to the police that Brooks told him that he had bought marijuana from Thompson and thought that he could rob him. Wakeel further stated that Brooks told him that he and two other men went to Thompson's house and knocked on the door as though he was going to buy marijuana. Brooks further told him that one of the men he was with drew a revolver after they entered the house while the other one went upstairs and found a woman there. Wakeel stated that Brooks told him that one of the men asked Thompson where the drugs were and, when Thompson refused to tell them, they shot him. Wakeel further stated to the police that Brooks

13

told him about the murder while they were smoking marijuana together on a soccer field and would mention it on occasion thereafter. Wakeel stated to the police that Brooks told him that they used a .38-caliber gun and that they had to kill Thompson because Thompson had known Brooks his entire life. Wakeel testified at trial that he could not recall giving these answers to the police. Id. at 40-63.

The Commonwealth called Officer David Marshall ("Marshall") as its next witness. Marshall testified that he worked for the Bensalem Township Police Department and that, on May 11, 2010, he went to the Lincoln Motel at 2277 Lincoln Highway. Marshall further testified that he came into contact with Defendant at the location when Defendant fled from a vehicle the police had been observing after the police decided to initiate a traffic stop. Marshall testified Defendant fled from the passenger side towards a wooded area near the motel and that he pursued Defendant into the woods. Marshall further testified that, as Defendant was running, his hand was up near the right side of his hip holding what appeared to be a bulky object. Marshall testified that they identified themselves as police and told Defendant to stop, but he continued to run. Marshall further testified that, as Defendant ran through the woods along the Bensalem side of the Poquessing Creek, he once turned towards him and reached for the same area around his waistband that he was holding as he started to flee, but appeared to be surprised when nothing was there. Marshall stated that Defendant eventually was arrested on the opposite side of the creek. Marshall testified that a .40-caliber Heckler & Koch semiautomatic with a black handgrip and a silver slide was recovered from a sandy area where Defendant had earlier fallen down near the start of the chase. Marshall stated that the gun, which had the serial number 26045373, was placed on a property receipt and taken to Philadelphia. (N.T. 5/13/2015 p. 12-24).

14

The Commonwealth called Officer Robin Song ("Song") as its next witness. Song testified that he worked in the 12th District and that, on August 16, 2010, he went to 1836 Yewdall Street to search for Brown. Song further testified that they knocked on the front door of the property and identified themselves as police, at which time a young black male opened the door and told them that Brown was upstairs. Song stated that they entered the house, identified themselves as police and told Brown to come downstairs but no one answered. Song further stated that he and a couple other officers went upstairs and searched different rooms for Brown. Song testified that he came upon a closet in one of the bedrooms that initially appeared to be filled with clothes but, upon further inspection, he noticed what appeared to be the top of a person's head. Song further testified that, after he confirmed that it was a person, he drew his weapon and told the person to put his hands up. Song stated that two hands appeared from the pile of clothes, at which time he pulled Brown out of the closet and arrested him. Id. at 28-32.

The Commonwealth called Officer Jeff Holden ("Holden") as its next witness. Holden testified that he was a Philadelphia Police Officer and that, on April 29, 2010, he recovered a fired cartridge casing from a .40-caliber firearm as well as a projectile of an unknown caliber from 2441 Brown Street. Id. at 37-38.

The Commonwealth called Officer Joseph Murray ("Murray") as its next witness. Murray testified that he worked for the Special Investigations Unit of Southwest Detectives and that, on June 10, 2010, he took a statement from Bowie. Murray testified that he had not been looking for Bowie and had not known Bowie before he was arrested by Rapone. Murray stated that Bowie was cooperative with him when he gave the statement and that he did not force or threaten Bowie to give him information. Murray further stated that Bowie was provided with food and the opportunity to use the bathroom and that he did not appear to be under the influence

15

of drugs or alcohol. Murray testified that he reviewed Bowie's rights with him prior to the statement and that Bowie signed his initials next to each right to indicate that he understood them. Id. at 40-47.

Murray testified that Bowie told him he had received the .40-caliber Glock 27 he had been arrested for carrying from Brown on the morning of June 9, 2010. Bowie further told him that Brown and Defendant took the firearms from Baker. Bowie stated that they took a silver and black .40-caliber semiautomatic and a .40-caliber black Glock from Baker, to go along with a .38-caliber revolver and a .45 ACP they already had. Murray further testified that Bowie identified Defendant's girlfriend as Jacklyn Smith and that Defendant was arrested while he was at a hotel with another woman, Tyiesha Williams. Bowie further stated that Brown and Defendant told him that they had killed an older man inside of a house in Southwest Philadelphia near Brown's house. Bowie stated that they told him it was a home invasion, that they believed the man had marijuana in his house and that they used .40-caliber firearms. Murray testified that Bowie never expressed any hesitation as to the accuracy of the statement and that he signed each page of the statement. Id. at 47-57.

Murray testified that he took a second statement from Bowie on June 23, 2010. Murray testified that Bowie stated that, at around 5:00 a.m., he, Defendant and Brown walked from 24th and Berks to Baker's house after Defendant's sister told them that Baker had guns and money at his house. Bowie further stated that Defendant and Brown stood behind Baker's truck and waited for Baker, then took a Glock 27 from Baker's hip and a HK .40-caliber gun. Bowie stated to the police that, on April 29, 2010 at 2441 Brown Street, Defendant fired the .38 caliber revolver while he fired the Glock 27. Bowie further stated that Hines told him that Defendant, Brown and a young male had participated in Thompson's murder. Murray testified that Bowie

16

signed each page of the second statement and did not express in any way that he was uncomfortable with the content of the statement or wanted to change anything about it. Murray further testified that Bowie told him that he was giving the information in the hopes of leniency and that he explained to Bowie that he could not promise anything to him nor could he receive leniency if the statements were false. Id. at 58-70.

Murray testified that he took a statement from Hines on June 11, 2010. Murray further testified that Hines stated that Defendant told him he had killed a man inside a house in Southwest Philadelphia. Murray testified that Hines did not express any hesitation about the accuracy of the statement or ask to change it. Murray further testified that, prior to the first interview with Bowie, the only information he had about Thompson's murder was that a murder had occurred at that location in Southwest Philadelphia. Murray stated that he did not respond to the scene of Thompson's murder nor had he ever spoken to anyone at Homicide about it. Murray testified that the statements with Bowie and Hines were not primarily concerned with the murder, that he did not try to elicit further information about the murders, and that there was never any discussion that Bowie or Hines might go to jail for Thompson's murder. Id. at 73-85.

The Commonwealth called Tracy Byard ("Byard") as its next witness. Byard testified that he worked for the Homicide Unit, but was not the assigned detective on Thompson's murder. Byard testified that, on March 2, 2010, he took a statement from Wakeel in connection to the murder. Byard further testified that he recorded Wakeel's answers verbatim and that Wakeel had the opportunity to review his statement. Byard testified that Wakeel signed each page of the statement to indicate that the statement was correct. Id. at 118-21.

The Commonwealth called Detective Thomas DeMalto ("DeMalto") as its next witness. DeMalto testified that he was assigned to Central Detectives and that, on November 9, 2009, he

17

took a statement from Baker. DeMalto further testified that Baker told him that three individuals came to his house and took his two .40-caliber guns. DeMalto testified that one of the firearms taken from Baker was a black and silver Heckler & Koch .40-caliber handgun with the serial number 26045373 while the other one was a black Glock .40-caliber handgun with the serial number KZZ043. DeMalto further testified that the serial number on the Heckler & Koch .40-caliber recovered from Defendant by Bensalem detectives matched the serial number of the Heckler & Koch .40-caliber handgun that was stolen from Baker while the firearm recovered from Bowie by Rapone on June 9, 2010 had the same serial number as the Glock that was taken from Baker. Id. at 137-46.

The Commonwealth called Officer Michael Maresca ("Maresca") as its next witness. Maresca testified that he was assigned to the Crime Scene Unit and that, on November 8, 2009, he investigated the crime scene at 6726 Trinity Street. Maresca stated that, before he entered the property, he searched for ballistic evidence or weapons but could not find any. Maresca testified that, when he entered the property, he looked to his left and saw Thompson lying on his back with his feet towards the door and his head towards the stairs. Maresca further testified that Thompson appeared to have a wound to his head and, when he approached him, he could see that there was a hole in his head. Maresca stated that he lifted Thompson's head and saw that there was a projectile underneath him. Maresca further stated that there was a t-shirt underneath Thompson's head and that his pants had fallen down to his knees. (N.T. 5/14/2015 p. 5-9).

Maresca testified that the projectile had mushroomed out and was found in a pool of blood on top of the t-shirt. Maresca further testified that he did not find any other ballistic evidence inside the house. Maresca stated that he tested some items found at the crime scene for DNA, but there was not enough to form a complete profile. Maresca further stated that he was

18

unable to find any fingerprints that were of use in the investigation. Maresca testified that, because no fired cartridge casing was found, it was probable that a revolver was used because the fired cartridge casing remains in the gun after a revolver had been fired. Maresca further testified that he submitted the projectile that was found to Kenneth Lay ("Lay") of the Firearms Identification Unit. Id. at 9-18.

The Commonwealth called Lay as its next witness. Lay testified that he was previously assigned to the Firearms Identification Unit as a supervisor and that he had worked for the Firearms Identification Unit for 19 years. Lay further testified that he underwent a three-year training program to join the unit and that he subsequently engaged in further training at the FBI laboratory, the ATF and various firearms manufacturers. Lay stated that he had been qualified as an expert in firearms identification 286 times in state and federal court. Lay was subsequently offered and accepted by this Court as an expert in firearms identification. Id. at 42-47.

Lay testified that the firearm recovered from Hines was a .38-caliber Lady Smith & Wesson special revolver with the serial number BDV1577. Lay further testified that the revolver came with four live rounds of ammunition and one fired cartridge casing. Lay stated that the bullet recovered from the murder scene was a .38-caliber bullet, while the projectile recovered from 2441 Brown Street on April 29, 2010 was also a .38-caliber bullet. Lay further stated that he compared the two projectiles to the .38-caliber gun that was recovered from Hines and was able to determine that the projectile recovered at 2441 Brown Street was fired from that particular gun. Lay testified that, with regard to the bullet recovered from Thompson's murder scene, the class characteristics of the bullet matched those of the revolver recovered from Hines but he was unable to determine whether the bullet was fired from that particular firearm due to

19

damage to the bullet and corrosion in the gun barrel. Lay further testified that the damage to the bullet could have been caused by the impact with Thompson's head. Id. at 60-69.

The Commonwealth called Detective David Schmidt ("Schmidt") as its next witness. Schmidt testified that he worked for the Homicide Unit and was the assigned detective for Thompson's murder. Schmidt further testified that Defendant was arrested on May 11, 2010 and that at the time of his arrest, he was 26 years old, weighed 150 pounds and was 5'6" tall. Schmidt testified that Brooks would not have had access to the statements of Bowie or Hines. Schmidt further testified that he first learned of the statements that Bowie and Hines gave shortly before Defendant and Brown were arrested and after Brooks gave his statement. Schmidt testified that, based on those statements, arrest warrants were obtained for Defendant and Brown. Schmidt further testified that Shasnatty Warner ("Warner") never contacted him about the case nor did anyone else ever contact him about a possible alibi. Schmidt stated that Bowie, Wakeel and Hines never contacted him about changing their statements. Id. at 84-108.

The Commonwealth read a stipulation, by and between counsel, that Defendant and Brown did not have a license to carry a firearm in the state of Pennsylvania. The Commonwealth further moved a certificate of non-licensure into evidence, which showed that, on November 8, 2009, neither Defendant nor Brown possessed a valid license to carry a firearm nor a valid sportsman's firearm permit. After moving the certificate of non-licensure into evidence, the Commonwealth rested. Id. at 161-62.

Defendant read a stipulation, by and between counsel, that Defendant was measured in court on May 13, 2015 and that he was 5'4" tall with shoes on when measured. Id. at 169.

Defendant called Warner as a witness. Warner testified that she dated Defendant from 2008 to 2010. Warner further testified that she was studying biology at Temple University in

20

November 2009 and that she and Defendant lived together at 1416 East Luzerne Street. Warner stated that she had a very busy schedule due to her studies and therefore she and Defendant set aside Sundays so they could spend time together. Warner further stated that they would spend the entire day together on every Sunday. Warner testified that she gave a statement to Investigator Sharon Williams of Sister's International Private Investigation Services on April 4, 2015. Warner stated that she told Defendant that he could give her information to his lawyer and that she did not go to the police because she did not believe it would make a difference. Id. at 170-75. After Warner testified, Defendant rested. Id. at 203.

## ISSUES

I.    WHETHER THE COURT ERRED WHEN IT ALLOWED A WITNESS WHO HAD BEEN PRESENT IN THE COURTROOM TO TESTIFY.

II.   WHETHER THE COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO PROCEED PRO SE.

III.  WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF ALL CHARGES.

IV.   WHETHER COURT ERRED WHEN IT ALLOWED EVIDENCE OF A SUBSEQUENT BAD ACT BY DEFENDANT.

## DISCUSSION

I.    THIS COURT DID NOT ERR WHEN IT ALLOWED A WITNESS WHO HAD BEEN PRESENT IN THE COURTROOM TO TESTIFY.

This Court did not err when it allowed Baker to testify after it was discovered that he had been present in the courtroom for a portion of Brooks' testimony. Once a sequestration order is in effect and a possible violation is brought to the court's attention, the trial court must determine, as a question of fact, whether there has been a violation and, if so, the remedy required. Commonwealth v. Schwartz, 419 Pa.Super. 251, 615 A.2d 350, 357 (1992) (citing Commonwealth v. Stinnett, 356 Pa.Super. 83, 514 A.2d 154 (1986)). In deciding whether to

21

allow a witness who violates a sequestration order to testify, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, the probable impact on the outcome of the trial, whether the witness intentionally disobeyed the order, and whether the party calling the witness procured the disobedience. Id. (citing Commonwealth v. Mokluk, 298 Pa.Super. 360, 444 A.2d 1214 (1982)). If a violation of a sequestration order is found, the remedy is a matter left to the discretion of the trial court, and, it is within the sound discretion of the trial court whether to allow the witness to testify with the proper cautionary instruction. Commonwealth v. Marinelli, 547 Pa. 294, 690 A.2d 203, 219 (1997) (citing Commonwealth v. Smith, 464 Pa. 314, 346 A.2d 757 (1975)).

In the case at bar, defense counsel objected after Defendant informed him that Baker was present in the courtroom during Brooks' testimony despite a sequestration order being in effect. Defendant subsequently requested that Baker be prevented from testifying due to his violation of the sequestration order. Defendant argued that Baker could tailor his description of the .38-caliber revolver Defendant possessed on November 9, 2009 to Brooks' testimony of the .38-caliber that Defendant possessed during Thompson's murder. The Commonwealth argued in response that he had informed Baker to meet him in the hallway outside of the courtroom and that he had taken every precaution to keep any witnesses outside the courtroom. The Commonwealth further argued that he did not know what Baker looked like, as he had only spoken to him over the phone, and that he was unaware that Baker was in the courtroom. This Court denied Defendant's motion to preclude Baker's testimony. This Court stated that Baker would not have had any knowledge of what was testified to by Brooks as his testimony concerned a separate incident and that Baker consequently would not have been influenced by Brooks' testimony. This Court further stated that the defense would be able to cross-examine

22

Baker on his violation of the sequestration order and any testimony that he heard while sitting in the courtroom. (N.T. 5/6/2015 p. 152-60).

This Court did not err when it allowed Baker to testify despite his violation of the sequestration order. As this Court noted, the impact of Brooks' testimony on Baker would have been minimal as it concerned a separate event that Baker would not have had any knowledge of and which was unrelated to the content of Baker's testimony. Moreover, the Commonwealth did not procure Baker's violation of the order but instead made reasonable efforts to ensure that none of their witnesses violated the order and was unaware that Baker was present in the courtroom. In allowing Baker to testify, this Court also allowed the defense to cross-examine Baker about his violation of the sequestration order and any possible effect it might have had on his testimony, which defense counsel subsequently did. Thus, the jury was able to assess any possible effect that Baker's violation of the sequestration order might have had upon his testimony and determine the weight and credibility of his testimony accordingly. Therefore, this Court did not err when it allowed Baker to testify despite his presence in the courtroom during a portion of Brooks' testimony.

## II. THIS COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO PROCEED PRO SE.

This Court did not err when it denied Defendant's motion to proceed *pro se*. A criminal defendant has a constitutional right, necessarily implied under the Sixth Amendment of the U.S. Constitution, to self-representation at trial. Commonwealth v. Spotz, 610 Pa. 17, 18 A.3d 244, 263 (2011) (citing Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). The right to self-representation is not automatic; rather, "the request to proceed *pro se* must be made timely and not for purposes of delay and must be clear and unequivocal." Commonwealth v. El, 602 Pa. 126, 977 A.2d 1158, 1163 (2009) (citing Commonwealth v. Davido, 582 Pa. 52,

23

868 A.2d 431, 438 (2005)). A defendant's request to proceed *pro se* should be analyzed based on the totality of the circumstances to determine whether it was unequivocal. Commonwealth v. Faulk, 2011 PA Super 76, 21 A.3d 1196, 1201 (2011). Courts generally consider a myriad of factors in concluding whether a request was unequivocal including: whether the request was for hybrid representation or merely for the appointment of standby or advisory counsel, the trial court's response to a request, whether a defendant has consistently vacillated in his request, and whether a request is the result of an emotional outburst. Id. If a request to proceed *pro se* is "employed as a bargaining device rather than as a clear demand for self representation," its denial is not an abuse of discretion. Commonwealth v. Brooks, 104 A.3d 466, 475 (Pa. 2014) (citing Davido, 868 A.2d at 440). The trial court does not have an obligation to assume that the request to proceed *pro se* must be granted, and then probe the party for support for the request, or to find weaknesses in the request, particularly if the trial court, which has the advantage of familiarity with the case and its history, and of observing in person the defendant requesting to represent himself, believes that further delay is the real reason for a request to represent oneself, a motivation the defendant is unlikely to simply admit, or when the request to self-represent is tied to an expression of dissatisfaction with appointed counsel. Id. at 477.

In the case at bar, this Court did not err when it denied Defendant's motion to proceed *pro se* as Defendant's request to represent himself was not unequivocal but rather was tied to an expression of dissatisfaction with appointed counsel. Defendant filed a *pro se* motion to proceed *pro se* on or about April 13, 2015. However, on January 24, 2014, Defendant previously had filed a motion for new counsel with this Court and indicated disagreements over trial strategy and personal differences as reasons.

24

Thus, in light of this Court's history with this case and familiarity with Defendant's long-standing desire to have new counsel appointed, this Court accurately perceived that Defendant's request to proceed *pro se* was not a manifestation of a desire for self-representation but was merely being employed as a bargaining chip for the appointment of new counsel. Tellingly, immediately after this Court denied his motion, Defendant stated, "I'm not happy with [appointed counsel's] representation." (N.T. 4/20/2015 p. 135). Furthermore, Defendant continued to seek the replacement of appointed counsel on appeal. On July 2, 2015, Defendant again sent this Court a letter detailing his dissatisfaction with appointed counsel and asked that he be replaced with an attorney from the Defender's Association. Defendant stated in the letter that he had filed a complaint against defense counsel with the Pennsylvania Bar Association. In August 2015, in light of Defendant's continued attempts to have him removed from his case, defense counsel filed a motion to withdraw and this Court permitted defense counsel to withdraw on August 4, 2015. Notably, Defendant did not seek to proceed *pro se* on appeal but instead requested that this Court appoint new appellate counsel for him, which this Court did on September 22, 2015. Moreover, after appointment of new counsel, new counsel did not file a new 1925(b) statement, but agreed with prior trial counsel on the issues to be raised and adopted trial counsel's 1925(b), in total, as his own, without revising or supplementing them. Thus, there is every indication in the history of this case and Defendant's own statements during the motions hearing that his request was not an unequivocal demand for self-representation but was yet another attempt to effect what he had been trying to achieve since January 2014, the removal and replacement of appointed counsel.

Furthermore, this Court determined that Defendant would not comply with the rules of evidence and criminal procedure. On April 20, 2015, this Court heard argument from Defendant

25

on his motion to proceed *pro se*, in the course of which it became readily apparent to this Court that Defendant would be unable to properly follow the rules of evidence and criminal procedure at trial. Almost immediately, this Court was able to determine that Defendant had misfiled his motion to proceed *pro se* with the Office of Judicial Records the week prior to the hearing and consequently this Court had not received a copy of the motion. Moreover, Defendant indicated during this Court's colloquy that he believed he could proceed *pro se* simply by informing defense counsel of his desire to proceed *pro se* and that he wished to proceed *pro se* because defense counsel allegedly refused to subpoena certain alibi witnesses and obtain a particular statement made by Brooks from the District Attorney's Office. However, defense counsel informed the Court that not only had the witnesses that Defendant requested already been subpoenaed but he had also received the complete discovery from the Commonwealth. Moreover, defense counsel informed the Court that the statement Defendant claimed was made by Brooks upon his arrest did not in fact exist, which was confirmed by the Commonwealth. (N.T. 4/20/2015 p. 126-36). Thus, in addition to the equivocal nature of his request to proceed *pro se*, it became readily apparent to this Court during Defendant's colloquy that he would be unable to properly follow the rules of evidence and criminal procedure at trial. Therefore, this Court did not err when it denied Defendant's motion to proceed *pro se*.

## III.   THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF ALL CHARGES.

### 1. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all

26

favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

### 2. The evidence was sufficient to find Defendant guilty of second-degree murder.

The evidence presented at trial was sufficient to find Defendant guilty of second-degree murder. A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being. 18 Pa.C.S.A. § 2501(a). A criminal homicide constitutes murder of the second degree when it is committed while the defendant was

27

engaged as a principal or an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping. 18 Pa.C.S.A. § 2502(b), (d). The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim. Commonwealth v. Lambert, 2002 PA Super 82, 795 A.2d 1010, 1021 (2002) (citing Commonwealth v. Mikell, 556 Pa. 509, 729 A.2d 566, 569 (1999)).

In the case at bar, the evidence was sufficient to find Defendant guilty of second-degree murder. Brooks testified that Defendant crouched over Thompson and shot him once in the head with the .38-caliber revolver while he was in engaged in the commission of a robbery. Collins testified that Thompson was killed in a manner consistent with someone crouching over him and shooting him once in the back of the head. Lay testified that the bullet specimen found underneath Thompson was from a .38-caliber firearm that had the same class characteristics as the .38-caliber revolver fired by Defendant on April 29, 2010 at 2441 Brown Street. Bowie and Hines each stated to the police that Defendant told them that he had killed an older man inside a house in Southwest Philadelphia during a robbery. Thus, the evidence was sufficient for the jury to find that Defendant shot and killed Thompson during the course of a robbery and was therefore guilty of second-degree murder.

> **3.     The evidence was sufficient to find Defendant guilty of robbery.**

The evidence presented at trial was sufficient to find Defendant guilty of robbery. A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another. 18 Pa.C.S.A. § 3701(i). A person is guilty of theft if he unlawfully takes movable property of another with the intent to deprive him thereof. 18 Pa.C.S.A. § 3921(a). An act shall

be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission. 18 Pa.C.S.A. § 3701(2). Serious bodily injury is defined as a bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S.A. § 2301.

In the case at bar, the evidence was sufficient to find Defendant guilty of robbery. Brooks testified that he, Defendant and Brown went to Thompson's house with the intent to steal drugs and money from Thompson and that, after Thompson answered his door, Defendant and Brown drew their firearms and ordered Thompson to lay on the ground. Brooks further testified that, while he and Brown searched the house for the drugs and money, Defendant hit Thompson on the head with his revolver and choked him before shooting him once in the head. Bowie stated to the police that Defendant told him that he, Brown and another person entered Thompson's home with the intent to take marijuana from him and shot him. Thomas testified at trial and Wakeel stated to the police that Brooks had told each of them that he had planned to rob Thompson with Defendant and Brown and that Thompson was subsequently shot by Defendant. Thus, the evidence was sufficient for the jury to find that Defendant inflicted serious bodily injury in the course of attempting to commit theft and was therefore guilty of robbery.

### 4. The evidence was sufficient to find Defendant guilty of conspiracy.

The evidence presented at trial was sufficient to find Defendant guilty of conspiracy. A conviction for conspiracy is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. Lambert, 795 A.2d at 1016 (citing Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 1025, 1030 (1996)). In most

29

cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." Commonwealth v. Sanchez, 82 A.3d 943, 973 (Pa. 2013) (quoting Commonwealth v. Johnson, 604 Pa. 167, 985 A.2d 915, 920 (2009)). Four factors are to be utilized in deciding if a conspiracy existed. Those factors are: "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." Commonwealth v. Nypaver, 2013 PA Super 144, 69 A.3d 708, 715 (2013) (quoting Commonwealth v. Feliciano, 67 A.3d 19, 25 (Pa.Super.2013)). The overt act need not accomplish the crime-it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. Commonwealth v. Weimer, 602 Pa. 33, 977 A.2d 1103, 1106 (2009).

In the case at bar, the evidence was sufficient to find Defendant guilty of conspiracy to commit murder. Brooks testified that, after Brown told them that they should leave, he replied that they could not leave without killing Thompson as Thompson knew him and might retaliate. Brooks further testified that, as he and Brown argued over who should kill Thompson, Defendant shot Thompson once in the head. Thomas testified that Brooks told her that Brown told him to kill Thompson and that, when he told Brown that he could not kill Thompson, the other man in their group shot Thompson. Wakeel stated to the police that Brooks had told him that he told Defendant and Brown that they had to kill Thompson because Thompson had known him his whole life. Thus, the jury could conclude from the evidence presented that Defendant, through his participation in the object of the conspiracy, entered into an agreement with Brown and Brooks to kill Thompson after Brooks told them that they could not leave Thompson's house

30

without killing him. The jury could further conclude that, when Defendant shot Thompson in the head, he committed an overt act in furtherance of that agreement to kill Thompson. Therefore, the evidence was sufficient to find Defendant guilty of conspiracy to commit murder.

### 5. The evidence was sufficient to find Defendant guilty of burglary.

The evidence presented at trial was sufficient to find Defendant guilty of burglary. A person is guilty of a burglary if he enters an occupied structure with the intent to commit a crime therein and without license or privilege to enter. Lambert, 795 A.2d at 1022. The intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. Id. (citing Commonwealth v. Alston, 539 Pa. 202, 651 A.2d 1092, 1094 (1994)). Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. Id. Under the burglary statute, a defendant commits first degree burglary if the location illegally entered: (1) is adapted for overnight accommodation but no individual is present; (2) is not adapted for overnight accommodation but an individual is present; or (3) is adapted for overnight accommodation and an individual is present. Commonwealth v. Waters, 2009 PA Super 257, 988 A.2d 681, 683 (citing Commonwealth v. Ausberry, 891 A.2d 752, 756 (Pa.Super. 2006)).

In the case at bar, the evidence was sufficient to find Defendant guilty of burglary. Brooks testified that he, Defendant and Brown went to Thompson's house with the intent to rob him of marijuana and money. Brooks further testified that, after Thompson answered the door, Defendant and Brown drew the firearms they were carrying and entered his property. Fahnbulleh testified that Thompson went downstairs to answer the doorbell and, a short time later, she saw two men with guns come upstairs. Bowie stated to the police that Defendant had killed an older man inside a house in Southwest Philadelphia during a home invasion robbery.

31

Wakeel stated to the police that Brooks told him that he and his partners went to Thompson's house with the intent to rob him and that they drew their guns after Thompson answered the door. Thus, the evidence presented at trial was sufficient for the jury to conclude that Defendant entered an occupied structure, namely Thompson's home, which was adapted for overnight accommodation and in which an individual, Thompson, was present with the intent to commit a robbery therein. Therefore, the evidence was sufficient to find Defendant guilty of burglary.

6. **The evidence was sufficient to find Defendant guilty of violation of the Uniform Firearms Act 6106.**

The evidence presented at trial was sufficient to find Defendant guilty of carrying a firearm without a license (VUFA 6106). Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license commits a felony of the third degree. 18 Pa.C.S.A. § 6106(a)(1). In order to convict a defendant for carrying a firearm without a license, the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business." Commonwealth v. Parker, 2004 PA Super 113, 847 A.2d 745, 750 (2004) (quoting Commonwealth v. Bavusa, 750 A.2d 855, 857 (Pa.Super. 2000)). To prove possession of a firearm, the Commonwealth must establish that an individual either had actual physical possession of the weapon or had the power of control over the weapon with the intention to exercise that control. In re R.N., 2008 PA Super 117, 951 A.2d 363, 369-70 (2008) (citing Commonwealth v. Carter, 304 Pa.Super. 142, 450 A.2d 142, 144 (1982)).

In the case at bar, the evidence was sufficient to find Defendant guilty of VUFA 6106. Brooks testified that he, Defendant and Brown walked from Brown's house to Thompson's house and that, after Thompson answered his door, Defendant and Brown drew the firearms they

32

were carrying. The parties stipulated that Defendant did not have a valid license to carry a firearm in Philadelphia and the Commonwealth moved a certificate of non-licensure into evidence which showed that Defendant did not possess a valid license to carry a firearm nor a valid sportsman permit in Pennsylvania on November 8, 2009. Thus, the evidence was sufficient for the jury to conclude that Defendant possessed a firearm concealed on his person outside of his home or place of business and that he did not have a valid license to carry a firearm. Therefore, the evidence was sufficient to find Defendant guilty of VUFA 6106.

## IV. THIS COURT DID NOT ERR WHEN IT ALLOWED EVIDENCE OF A SUBSEQUENT BAD ACT BY DEFENDANT.

This Court did not err when it allowed evidence that Defendant robbed Baker the morning after Thompson's murder with the same caliber and type of revolver as that used in the murder. Generally, evidence is admissible if it is relevant, that is, "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." Commonwealth v. Kinard, 2014 PA Super 41, 95 A.3d 279, 284 (2014) (quoting Commonwealth v. Williams, 586 Pa. 553, 896 A.2d 523, 539 (2006)). Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. Commonwealth v. Owens, 2007 PA Super 213, 929 A.2d 1187, 1191 (2007) (citing Commonwealth v. Broaster, 863 A.2d 588, 592 (Pa.Super. 2004)). A trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which a defendant is charged. Id.

33

The general rule is that where weapon evidence cannot be specifically linked to a crime, such evidence is not admissible. Owens, 929 A.2d at 1191 (citing Commonwealth v. Robinson, 554 Pa. 293, 721 A.2d 344, 351 (1998)). The exception to this general rule is where the accused had a weapon or implement suitable to the commission of the crime charged. This evidence is always a proper ingredient of the case for the prosecution. Id. (citing Robinson, 721 A.2d at 351). A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Id. (citing Broaster, 863 A.2d at 592). Uncertainty whether the weapon evidence was actually used in the crime goes to the weight of such evidence, not its admissibility. Id. (citing Commonwealth v. Williams, 537 Pa. 1, 640 A.2d 1251, 1260 (1994)).

In the case at bar, the Commonwealth argued that case law has consistently allowed evidence of a separate incident to show identity when the same gun or a similar gun was used by the defendant. The Commonwealth cited in support to Commonwealth v. Reid, in which the Supreme Court upheld the admission of evidence that the defendant had committed a separate murder with the same gun six days after the crime in question, and to Commonwealth v. Cousar, in which the Supreme Court upheld the admission of evidence that the defendant committed a robbery with the same gun more than a month after the initial crimes in question. *See* Commonwealth v. Reid, 533 Pa. 508, 626 A.2d 118 (1993); *see also* Commonwealth v. Cousar, 593 Pa. 204, 928 A.2d 1025 (2007). Defendant argued in response that evidence of the robbery would be unduly prejudicial. (N.T. 4/20/2015 p. 54-76).

This Court did not err when it allowed evidence that Defendant robbed Baker the morning after Thompson's murder with the same caliber and type of revolver that was used in

34

the murder. Brooks testified that Defendant shot Thompson using a .38-caliber revolver with a barrel that was approximately four inches in length. Baker testified that Defendant was in possession of a .38-caliber revolver with a barrel that was approximately three inches in length when Defendant and Brown took his guns. Thus, evidence that Defendant was in possession of a weapon similar to the one used in perpetration of the crime on the morning after the murder was properly admissible to prove Defendant's identity as the shooter in the instant case. Any uncertainty as to whether the .38-caliber revolver possessed by Defendant on the morning of November 9, 2009 was the same as the .38-caliber revolver he possessed on the night of November 8, 2009 went to the weight that the jury placed upon the evidence, not to its admissibility. Therefore, this Court did not err when it allowed evidence that Defendant robbed Baker the morning after the murder with the same caliber and type of revolver as that used in Thompson's murder.

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. This Court did not err when it allowed Baker to testify despite his violation of the sequestration order. This Court did not err when it denied Defendant's motion to proceed *pro se*. The evidence was sufficient to find Defendant guilty of all charges. This Court did not err when it allowed evidence of a subsequent bad act by Defendant. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____ J.